515 F.2d 541
 Jane DOE, et al., Appellants,
v.
John H. POELKER, Mayor of the City of St. Louis, Missouri,
and R. DeanWochner, M.D., Director of the Department of
Health and Hospitals and ActingHospital Commissioner of the
City of St. Louis, Missouri, Appellees.
 No. 75-1069.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 14, 1975.
Decided April 14, 1975.
As Modified on Denial of Rehearing and Rehearing En Banc May
7, 1975.
As Amended June 2, 1975.
 
 Frank Susman, Susman, Schermer, Willer & Rimmel, St. Louis, Mo., for appellants.
 Eugene P. Freeman, Deputy City Counselor, St. Louis, Mo., for appellees.
 Before VAN OOSTERHOUT, Senior Circuit Judge, ROSS, Circuit Judge, and TALBOT SMITH, Senior District Judge.*
 ROSS, Circuit Judge.
 
 
 1
 Jane Doe,[1] a pregnant resident of St. Louis, Missouri, at the time the lawsuit was filed, brought this civil rights class action under 42 U.S.C. § 1983 against John H. Poelker, the Mayor of St. Louis, and Dr. R. Dean Wochner, the Director of the Department of Health and Hospitals and Acting Hospital Commissioner of St. Louis, (hereinafter referred to collectively as "the city") seeking, in her broadly worded complaint, declaratory and injunctive relief
 
 
 2
 against the existence, application, implementation and enforcement of express and implied policies, rules, regulations, procedures and practices barring, thwarting, limiting and infringing upon the utilization of the personnel, facilities and services of the general, public hospitals of the City of St. Louis, Missouri . . . for the performance of abortions.
 
 
 3
 The jurisdiction of the federal court was based on 28 U.S.C. § 1343.
 
 
 4
 On March 22, 1974, the district court[2] sustained a motion by the city and dismissed the complaint for lack of standing and mootness. On appeal this Court reversed and remanded for further proceedings. Doe v. Poelker, 497 F.2d 1063, 1067 (8th Cir. 1974).
 
 
 5
 Accordingly, a trial to the court was held on November 25, 1974, and on January 13, 1975, the court issued a memorandum and order finding for the city and dismissing the complaint with prejudice. The trial judge appears to have agreed with Doe that there is a city policy prohibiting abortions, but he never considered the constitutionality of such a policy because he felt that Doe had failed to establish that the policy had been applied to her. Instead, it was his opinion that Doe had merely been refused an abortion by certain physicians at the city hospital's obstetrics-gynecology clinic because of their own personal moral and ethical beliefs on that subject. We reverse.
 
 
 6
 The incidents giving rise to this litigation occurred during August, 1973. Doe, the mother of two who was in severe financial straits and who had reason to fear that her husband might be sent to prison, suspected she might be pregnant. She had had five prior miscarriages. She went to the gynecology clinic at Max C. Starkloff Hospital, owned and operated by the city, and was examined by a third-year medical student assigned to the hospital. Although the student did not recall the conversation, Doe testified that she asked him at that time if she could obtain an abortion at the city hospital and that he had responded that it could not be done because it was against hospital policy. Doe returned to the clinic six days later for the results of the laboratory pregnancy test, and when informed by another medical student who was examining her that the result was positive she requested an abortion at the hospital. The student indicated that he had personal convictions against abortions and that he knew of no one at the city hospital to whom to refer Doe. However, an appointment was made for the next day at the obstetrics clinic.
 
 
 7
 At that clinic Doe was seen by Dr. William J. Ott, at that time the chief resident from St. Louis University in the obstetrical service at the city hospital. She told Dr. Ott that she desired an abortion. Dr. Ott, having strong personal beliefs on the subject, refused to consider it and refused to give her even a written statement as to her state of pregnancy. Instead he referred her to another physician at the clinic, Dr. Ziad Abu Dalu, who saw her that same day and the next. Both times Doe requested an abortion at city hospital and Dr. Abu Dalu refused, telling her "that we couldn't do one at City Hospital." Dr. Abu Dalu does have personal convictions against abortions, but did not elaborate them to Doe. Subsequent to the filing of this lawsuit, Doe was aborted at a private clinic in St. Louis.
 
 
 8
 While the students and doctors who saw Doe at the clinic were aware of her personal family and financial problems none of them found any "medical reasons" to justify an abortion, defining such reasons as severe sickness of the patient such as "severe diabetes," "severe heart condition" or "something of that type." Doe was suffering from cervical fibroid tumors and polyps, an extremely retroverted uterus and trichomycosis.
 
 
 9
 The district court impliedly found, and there can be no doubt, that there is an official St. Louis city policy promulgated by the mayor prohibiting the performance of abortions in the city-owned public hospitals for reasons other than to save the mother from grave physiological injury or death. The city admitted as much in its answer to the complaint, and the mayor himself testified that, upon taking office in the spring of 1973, he directed that the existing policy be continued, understanding that it allowed abortions only if the life of the mother was in danger.[3] Additionally, Dr. Wochner stated that such a policy had been given to him by the mayor to carry out.
 
 
 10
 In addition to the policy, the evidence reveals that there is a "procedure and practice" which operates to bar the performance of abortions at the city's hospitals the method of staffing the obstetrics-gynecology clinic.[4] The clinic, which is provided by the city, at least in part, to care for indigent patients, is staffed entirely by faculty and students from the St. Louis University School of Medicine. That university is a Catholic, Jesuit-operated institution, and its faculty manual calls for the discharge of any faculty member who engages in "(a) grave offense in the discharge of University responsibilities, which is clearly against well-established principles of Catholic morality." One witness, a Jesuit professor at the university, testified that the performance of an abortion by a faculty member would be a "gravely immoral (act) by Catholic standards." As such, of course, it would subject him to discharge.
 
 
 11
 Dr. Frank Ostapowicz, a professor at the School of Medicine and Chief of Gynecological and Obstetrical services at the city hospital testified by affidavit that he had told the city's Director of Health and Hospitals (Dr. Wochner) that
 
 
 12
 neither I, those under my direction and supervision, or St. Louis University Medical School with which we were (and are) all associated, would participate in providing abortion services to women who did not have true medically grave reasons which furnished professionally ethical and moral justification for such procedure.
 
 
 13
 The result of this staffing exclusively from St. Louis University, together with the official policy of the city, is that indigent pregnant women who desire abortions are unable to find a physician at the city OB-GYN clinic who will perform one.[5]
 
 
 14
 The official city policy and the "staffing procedure" were applied to Doe and the other members of her class and successfully prevented them from utilizing the city's hospitals to obtain abortions. Dr. Wochner testified that had it not been for the policy promulgated by the mayor he would have proceeded to implement the providing of abortions at the city's public hospitals. This evidence strongly suggests that had the policy not been extant, Doe could have obtained an abortion at the city hospital. Additionally, there is evidence that Doe was specifically told that she could not have an abortion at the city hospital, again indicating that it was the city policy which prevented the use of these facilities for that purpose. Likewise, it is clear that the staffing procedure effectively foreclosed any possibility that any pregnant woman could ever find a staff physician who would agree to perform an abortion in the city hospital unless her life or health was in severe danger. The conclusion that Doe was not affected by the policy and the staffing procedure simply cannot stand in light of this evidence and the salient fact that, despite a number of requests, not a single abortion has been performed in the St. Louis public hospitals since before the Supreme Court's abortion decisions in January, 1973, to date.
 
 
 15
 The district court reasoned and the city contends on appeal that no woman has an absolute constitutional right to an abortion on demand and that, therefore, Doe has no right to demand that the clinic doctors at city hospital perform an abortion on her. Regardless of the merits of this argument, we think it misses completely the point of this litigation. Doe does not "demand" an abortion; but, rather, she asks that the city not deny her equal protection of the law by interfering in her decision of whether to bear a child or have an abortion simply because she is indigent and unable to afford private treatment. Stripped of all rhetoric, the city here, through its policy and staffing procedure, is simply telling indigent women, like Doe, that if they choose to carry their pregnancies to term, the city will provide physicians and medical facilities for full maternity care; but if they choose to exercise their constitutionally protected right to determine that they wish to terminate the pregnancy, the city will not provide physicians and facilities for the abortion procedure, even though it is probably safer than going through a full pregnancy and childbirth. Roe v. Wade, 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). No rational or legally cognizable basis for this distinction is offered.[6] And it is certainly true that this distinctive treatment represents as much interference in the abortion decision of an indigent woman by the city as the prohibition of all nontherapeutic abortions in city-operated hospitals condemned by this Court in Nyberg v. City of Virginia, 495 F.2d 1342 (8th Cir.), appeal dismissed, --- U.S. ---, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974).
 
 
 16
 Such arbitrary governmental discrimination against indigent women choosing to have an abortion has been roundly denounced by the courts. Wulff v. Singleton, 508 F.2d 1211, 1215-1216 (8th Cir. 1974); Doe v. Rose, 499 F.2d 1112, 1115-1117 (10th Cir. 1974); Doe v. Rampton, 366 F.Supp. 189, 193 (D. Utah 1973) (3-judge court); Klein v. Nassau County Medical Center, 347 F.Supp. 496, 500-501 (E.D.N.Y.1972) (3-judge court), vacated and remanded for further consideration in light of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); Nassau County Medical Center v. Klein, 412 U.S. 925-926, 93 S.Ct. 2748, 37 L.Ed.2d 152 (1973). In the recent decision in Wulff v. Singleton, supra, 508 F.2d at 1215, the State of Missouri had by statute prohibited medicaid payments to women receiving welfare benefits who had undergone nontherapeutic abortions while, at the same time, providing such payments to women welfare recipients who carried their pregnancies to term. This Court stated: "This classification is a clear violation of the Equal Protection Clause of the Fourteenth Amendment." There is no practical distinction between that case and this one.
 
 
 17
 The three-judge district court in Klein v. Nassau County Medical Center, supra, 347 F.Supp. at 500, gave the rationale underlying its decision that the equal protection clause prohibited New York State from providing medical assistance to indigent mothers who carried their pregnancies to term but not to those who choose to have nontherapeutic abortions in language which we find equally compelling in the circumstances of the instant case.
 
 
 18
 The directive (prohibiting medical assistance to indigent women having nontherapeutic abortions) . . . den(ies) indigent women the equal protection of the laws to which they are constitutionally entitled. They alone are subjected to State coercion to bear children which they do not wish to bear, and no other women similarly situated are so coerced. Other women, able to afford the medical cost of either a justifiable abortional act or full term child birth, have complete freedom to make the choice in the light of the manifold of considerations directly relevant to the problem uninhibited by any State action. The indigent is advised by the State that the State will deny her medical assistance unless she resigns her freedom of choice and bears the child. She is denied the medical assistance that is in general her statutory entitlement, and that is otherwise extended to her even with respect to her pregnancy. She is thus discriminated against both by reason of her poverty and by reason of her behavorial choice.
 
 
 19
 We conclude that the city policy against all nontherapeutic abortions together with the staffing procedures at the OB-GYN clinic of the city hospital combine to deny Doe and her class the equal protection of the law.[7]Remedy
 
 
 20
 We declare the city's policy prohibiting all nontherapeutic abortions in its publicly owned hospitals to be unconstitutional as an unwarranted infringement on pregnant women's right to privacy and as a denial of equal protection to indigent pregnant women. Likewise, we declare the method of staffing the obstetrics-gynecology clinic of the city hospitals to be an unconstitutional denial of equal protection to those indigent pregnant women who, in exercising their right to privacy, may choose to terminate the pregnancy under the guidelines laid down by Roe v. Wade, supra, and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). We hold that both city owned hospital facilities must be made available for abortion services as they are for other medical procedures. Nyberg v. City of Virginia, supra, 495 F.2d at 1347.
 
 
 21
 We remand the cause to the district court for the fashioning of prompt and appropriate declaratory relief. In addition to declaring the necessity to change the city's antiabortion hospital policy, this relief should, at a minimum, impose upon the city the duty to obtain the services of responsible physicians and other necessary personnel whose personal views on abortion do not prohibit them from providing an abortion. It must also provide the necessary equipment and facilities to accomplish the goal. In short, the city will not be allowed to achieve indirectly through its manner of staffing its hospitals what it cannot accomplish directly the prohibition of all nontherapeutic abortions in those hospitals. As stated by the Supreme Court in the context of school desegration:
 
 
 22
 (C)onstitutional rights . . . not to be discriminated against . . . can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes . . . whether attempted "ingeniously or ingenuously."
 
 
 23
 Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).
 
 
 24
 We stress, however, that the remedy is to be directed at the city officials acting as such and should declare the necessity to take certain official actions. It should not require that any present member of the staff of the public hospitals or any individual employee of the hospitals participate or assist in any way in the performance of abortions if, as a matter of conscience, he objects to so doing. See Doe v. Hale Hospital, 500 F.2d 144, 147 (1st Cir. 1974), cert. denied, 420 U.S. 907, 95 S.Ct. 825, 42 L.Ed.2d 837 (1975); Nyberg v. City of Virginia, supra, 495 F.2d at 1347.
 
 Attorneys' Fees
 
 25
 On appeal Doe asks that she be awarded attorneys' fees as costs. The traditional American rule ordinarily disfavors allowance of attorneys' fees to the prevailing party. It is clear, however, that the federal courts do have equitable power to award such fees when, in the interests of justice, the situation calls for them to do so. Hall v. Cole, 412 U.S. 1, 4-5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); Sprague v. Ticonic National Bank, 307 U.S. 161, 166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).
 
 
 26
 Prior to the recent Supreme Court decision in Alyeska Pipeline Service Co. v. Wilderness Society, --- U.S. ---, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), we had believed that one recognized exception to the American rule was where a party acted as a "private attorney general" in vindicating an important public policy. See Fowler v. Schwarzwalder, 498 F.2d 143, 145-146 (8th Cir. 1974). However, the Alyeska Pipeline opinion has now conclusively established that the "private attorney general" exception exists only where provided by specific congressional act. Alyeska Pipeline Service Co. v. Wilderness Society, supra, --- U.S. at ---, 95 S.Ct. 1612. Therefore, attorneys' fees may not be awarded under this theory in the instant case.
 
 
 27
 Nonetheless, we are convinced that an award of attorneys' fees to Doe is proper here under another exception to the rule which was specifically recognized and reiterated in Alyeska Pipeline "when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " Id. --- U.S. ---, 95 S.Ct. at 1622 (quoting F. D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974)). See, e. g., Fowler v. Schwarzwalder, supra, 498 F.2d at 144 (dictum); Bell v. School Board, 321 F.2d 494, 500 (4th Cir. 1963).
 
 
 28
 The long history of abortion litigation involving the State of Missouri and the City of St. Louis certainly suggests that these governments have delayed complying with the clear dictates of the Supreme Court and this Court relating to abortion to the maximum extent and have obstinately continued to implement and enforce statutes, regulations and policies designed to circumvent the constitutional law declared by the Supreme Court. See Wulff v. Singleton, upra ; Doe v. Poelker, supra ; Word v. Poelker, 495 F.2d 1349 (8th Cir. 1974). More specifically, the history of this particular litigation reveals a wanton, callous disregard for the constitutional rights of indigent pregnant women continuing long after those rights had been clearly enunciated by the Supreme Court in Roe v. Wade, supra, and Doe v. Bolton, supra.
 
 
 29
 Mayor Poelker took office in the Spring of 1973, after Roe and Doe were decided in January of that year. Nonetheless, he deliberately ordered that the city's anti-abortion policy be kept in effect because "(a)t the early stages there was . . . some contest to the decision as it applied (in Missouri)" and because of his "own personal conviction that abortion is murder." This implementation of his own personal moral precepts was done in spite of the recommendation of Dr. Wochner "that abortions should be provided under circumstances broader than that defined by the phrase, 'When the mother's life is in jeopardy.' "
 
 
 30
 When Doe finally challenged the policy by filing the instant complaint the city,[8] as soon as it learned that her pregnancy had been terminated, sought to have that complaint dismissed for lack of standing even though, as this Court pointed out on appeal from the resulting dismissal, the "conclusion that Doe has standing is mandated by the resolution of the identical issue in Roe v. Wade, supra, 410 U.S. at 124 (93 S.Ct. 705), and Doe v. Bolton, supra, 410 U.S. at 187 (93 S.Ct. 739)." Doe v. Poelker, supra, 497 F.2d at 1066. (Poelker did not attempt to appeal this decision.) In short, well over a year after Roe and Doe were decided the city was still arguing that a pregnant woman lost her standing to challenge abortion laws once her pregnancy terminated, in spite of the clear dictates of the Supreme Court to the contrary. This, of course, was an effective tactic to delay a decision on the merits; but we believe the record is clear that it was pursued for an oppressive reason to keep indigent pregnant women from exercising their constitutional rights in the abortion decision for the maximum period of time.
 
 
 31
 We simply cannot close our eyes to a course of conduct in policy-making and litigating which, at the very least, reflects a wanton disregard for the constitutional rights of the plaintiff and other indigent pregnant women in St. Louis. Neither can we ignore the fact that the unconstitutional city policy was designed by Mayor Poelker to operate against a class of individuals whose economic status was such as to leave them relatively defenseless against this violation of their rights. The city has been obdurate and obstinate in compelling these women to conform to the mayor's personal moral beliefs on the abortion issue. The fact that no abortions have been performed in the city's hospitals since the Roe and Doe decisions attests to the effective and oppressive nature of the mayor's policy and the defense of it in the courts.
 
 
 32
 Accordingly, we award Doe attorneys' fees for the appellate portion of this litigation in the sum of $3,500 against the defendant Poelker.[9] On remand the district court is directed to determine attorneys' fees and to award them to Doe, together with court costs, against the defendant Poelker for that portion of this case carried on in that court. This should be a fair award based on the guidelines listed in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (5th Cir. 1974).
 
 Conclusion
 
 33
 For the reasons discussed in this opinion the judgment of the district court is reversed and the case is remanded for the prompt fashioning of declaratory[10] relief and for awarding attorneys' fees to the appellant Doe for services in the district court.
 
 
 34
 VAN OOSTERHOUT, Senior Circuit Judge (concurring in part and dissenting in part).
 
 
 35
 The effect of the amended opinion of the majority is to vacate the award of attorneys' fees under the private attorney general exception to the prevailing American rule disallowing attorneys' fees to the successful party and the granting of attorneys' fees under the bad faith exception to the general rule. I agree with the majority that the vacation of our prior allowance of attorneys' fees on appeal under the private attorney general exception is required by Alyeska Pipeline Service Co. v. Wilderness Society, --- U.S. ---, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). I dissent from the award of attorneys' fees on appeal and the remand to the district court with direction to award attorneys' fees for services in the district court on the basis that the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. My dissent is based on several grounds.
 
 I.
 
 36
 The plaintiffs have not met the burden resting upon them to demonstrate that they properly raised the issue of their right to attorneys' fees on the basis of the bad faith exception to the general rule. It is well-settled law that issues not raised in the trial court or upon appeal cannot be considered by an appellate court as a basis for reversal. See Smith v. American Guild of Variety Artists, 368 F.2d 511, 514-515 (8th Cir. 1966), and cases there cited. Plaintiffs in their brief upon appeal state: "Appellants respectfully request that pursuant to the jurisdictional grounds of their 'Complaint', specifically set forth in paragraph 1 of same, this Honorable Court award to appellants a reasonable attorneys' fees." Paragraph 1 of the complaint merely sets out the jurisdictional basis for the action and makes no claim either in that paragraph or in the prayer for attorneys' fees. Plaintiffs in brief argue that they are entitled to attorneys' fees under the private attorney general exception to the general rule. No mention is made of the bad faith exception claim.
 
 
 37
 It is unfair to the trial court and the litigants to allow the recovery of attorneys' fees on the basis of an issue not raised in the trial court or properly raised upon appeal. Under such circumstances, the litigants are not afforded a fair opportunity to meet the issue by evidence or briefs. Upon the original submission of the appeal the bad faith issue was not briefed.
 
 II.
 
 38
 No fact finding on the bad faith issue was made by the trial court. No request for a Rule 52(b) amendment for a finding upon the issue was made.
 
 
 39
 Under Rule 52(a), in cases tried to the court the trial court is the appropriate fact finder. The trial court's findings can be set aside only if clearly erroneous. We have no right to try cases de novo. Thus if contrary to what has heretofore been said, the bad faith exception is properly before us, the case should be remanded to the trial court for determination of such issue.
 
 III.
 
 40
 The discretion for awarding attorneys' fees under appropriate circumstances, absent statute or contract providing for such fees, rests in the trial court subject to review for abuse of discretion. We cannot substitute our discretion for that of the trial court.
 
 IV.
 
 41
 Alyeska recognizes that upon a proper record attorneys' fees can be granted in the court's discretion for willful disobedience of a court order or bad faith. The Supreme Court in that case rejected the attorneys' fees award granted on the basis of private attorney general exception but did not proceed to determine whether such relief could be granted under another exception to the general rule nor did it remand the case for such determination.
 
 
 42
 Since I am of the view that the resolution of the attorneys' fees on the bad faith issue is not properly before us, I express no view on the merits of such contention. I dissent from the award of attorneys' fees on appeal and the remand to the district court for mandatory determination of attorneys' fees in that court.
 
 
 
 *
 Talbot Smith, Senior District Judge, Eastern District of Michigan, sitting by designation
 
 
 [1]
 "Jane Doe" is a pseudonym for the actual plaintiff. It has been utilized throughout this litigation to protect her true identity in order to avoid harassment due to the controversial nature of the subject matter of this action
 
 
 [2]
 The Honorable Roy W. Harper, Senior United States District Judge, Eastern District of Missouri
 
 
 [3]
 It is noteworthy that this specific directive was promulgated by Mayor Poelker several months after the Supreme Court's abortion decisions were announced on January 22, 1973. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)
 
 
 [4]
 From exchanges which occurred during the trial it appears that the district judge thought the complaint was not broad enough to cover an attack on the staffing of the OB-GYN clinic. We disagree. The complaint specifically mentions "procedures and practices" which thwart the performance of abortions as being under attack. The manner of staffing a hospital is certainly a "procedure and practice" of that hospital. And, of course, any complaint must be read in the light of Fed.R.Civ.P. 8(f), which states that "(a)ll pleadings shall be so construed as to do substantial justice."
 The city can hardly complain that it was surprised by the staffing issue in view of the broad wording of the complaint. It certainly knew that the gravamen was an attack on everything the city did which had the effect of keeping abortions from being performed in its hospitals. And when Doe put on evidence relating to staffing, the city did not ask for a continuance or attempt to offer any contrary evidence of its own.
 
 
 [5]
 The city operates two general hospitals, Max C. Starkloff Hospital and Homer G. Phillips Hospital. The OB-GYN clinic to which Doe went was at Starkloff, and it is staffed as described in the text. There is some indication in the record that there is also an OB-GYN clinic at Phillips. There is no evidence regarding its staffing. However, the evidence strongly indicates that Doe could not have received an abortion at Phillips. No abortions had been performed at either hospital since January, 1973. And when Doe told the physicians at the clinic that she desired an abortion they referred her to Planned Parenthood or to the counselors at Starkloff, not to the clinic at Phillips
 
 
 [6]
 The city had conducted no cost estimates or any other serious studies to see whether or not it was fiscally feasible to perform abortions in city hospitals. Dr. Wochner did testify that he thought it would generally be less expensive to perform an abortion than to deliver a baby. The only reason advanced by the mayor for his policy was his own personal conviction that abortion was tantamount to murder
 
 
 [7]
 The city urges as a defense that its policy and staffing were authorized by Mo.Rev.Stat. § 197.032 (Supp.1975), V.A.M.S. which provides:
 No physician or surgeon, registered nurse, practical nurse, midwife or hospital, public or private, shall be required to treat or admit for treatment any woman for the purpose of abortion if such treatment or admission for treatment is contrary to the established policy of, or the moral, ethical or religious beliefs of, such physician, surgeon, registered nurse, midwife, practical nurse or hospital.
 Doe does not attack this statute in the instant litigation. Nonetheless, there is no merit to the city's argument. The city's policies and acts must be judged against the federal Constitution in this action under 42 U.S.C. § 1983. The very purpose of section 1983 would be completely obliterated if local officials were to have their actions judged only in the light of state law and not under constitutional standards.
 It may appear to follow logically from our holding in this case that the Missouri statute is unconstitutional. However, that question is not before us, and we do not decide it. We simply review the city's policy and procedures under established constitutional principles and find them lacking.
 
 
 [8]
 An indication of the intransigent attitude of the Mayor of the City of St. Louis toward the subject of abortion, and his complete rejection of the mandates of the Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), is found in his answer to the complaint, some portions of which are set forth as follows:
 Abortion, for reasons other than to save the mother from grave physiological injury or death, is against and contrary to the laws and public policy of the State and City.
 Abortion, for reasons other than to safeguard the mother from grave physiological bodily injury or death, has never been within those medical services rendered by the hospitals of the City of St. Louis and has been both illegal (as aforesaid) and outside of, contrary to and prohibited by medical policies and judgment of the medical authorities of such hospitals.
 The City and its inhabitants, acting through duly empowered representatives, has the right to make reasonable determinations as to what medical services shall be supplied in the public hospitals of such City; and abortion, other than to protect the mother from grave physiological injury or death, is a medical procedure which lawfully can and has been reasonably excluded from such services given by the City's hospitals.
 All qualified natural persons have an inalienable natural right to participate in the institution of marriage, which no government has any lawful right to deny or substanially interfere with.
 The people of the United states, and particularly the people of the State of Missouri, have a natural right, and a United States Constitutional right to have the Government of the United States, including its judiciary, protect, conserve and guard the institution of marriage in its essential character aforesaid, and to not disturb, negate and destroy such institution by purporting to grant to a female within such institution a unilateral, unconditional right to decide whether to bear children resulting from such marriage, and to carry out through abortion her negative decision.
 For the Government of the United States to purport to grant such right to such a female as aforesaid, including plaintiff, is a fundamental violation of the natural rights of the people of the United States and particularly the people of the State of Missouri, and of the Constitution of the United States by asserting powers prohibited by Article IX of the Amendments of said Constitution and not delegated but reserved by the people according to Article X of the Constitution.
 For the United States Government to so alter the institution of marriage in its essential nature and character would be a purported amendment of the Constitution of the United States by a method or way unauthorized by said Constitution and particularly Article V, thereof, in violation of said Ninth and Tenth Amendments of the United States Constitution and a violation of the distributive individual rights of the people of Missouri, and person, particularly the husband in each marriage existent of the State of Missouri, to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.
 
 
 [9]
 The evidence reveals that defendant Wochner was an appointee of the mayor and that he was simply carrying out his superior's orders in implementing the city policy. Therefore, we do not feel that attorneys' fees should be awarded against him
 
 
 [10]
 There is no question but what injunctive relief rather than declaratory relief would be the proper remedy in this case. However, after requesting injunctive relief in her complaint, plaintiff later specifically withdrew that request. Under these circumstances we hesitate to invoke Fed.R.Civ.P. 54(c)