Jane DOE, Individually and on behalf of all others similarly situated, et al.

v.

F. David MATHEWS, Secretary, United States Department of Health, Education and Welfare.

Civ. No. 76–1912.

United States District Court, D. New Jersey.

Oct. 1, 1976.

Nadine Taub, Newark, N. J.; Harriet F. Pilpel, Frederic S. Nathan, Laurence Vogel, Greenbaum, Wolff & Ernst, Sylvia A. Law, Rhonda Copelon, Nancy Stearns, Jill Laurie Goodman, and Judith Mears, New York City, of counsel, for plaintiffs.

Jonathan L. Goldstein, U. S. Atty., William E. Staehle, Z. Lance Samay, Asst. U. S. Attys., Newark, N. J., for defendant.

## OPINION

BIUNNO, District Judge.

This case is before the court on an application for an order to show cause, with temporary restraint, why the defendant Mathews (Secretary of the U.S. Department of Health, Education and Welfare, HEW), should not be enjoined *pendente lite* from enforcing the so-called "Hyde Amendment", a provision of the Appropriations Act for the Department of Labor and HEW. That act, embodying the Hyde Amendment, evidently became law on September 30, 1976 by virtue of the vote, in both Houses of Congress (67 to 15 in the Senate, and 312 to 93 in the House) to override a presidential veto of the bill, see U.S.Const., Art. I, § 7, cl. 2, requiring a two-thirds vote for that purpose.

The law involved is an appropriations law, for the two departments mentioned, covering the new fiscal year October 1, 1976 through September 30, 1977. The portion of that law which is challenged, the Hyde Amendment, is a single sentence which reads:

"None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term."

Taken literally, the language may be said to be inapt, and so requires construction. No funds are "contained" in any Act; funds are contained only in the Treasury. Nor are funds "used" to "perform" abortions; instruments, medications or other means may be used to "perform" abortions and funds are pertinent only to the extent that they are payment for the application of those means. In all that follows, the sense and meaning of the challenged sentence will be taken as the equivalent of saying that:

"No appropriation made by this Act is authorized by law to be paid for performing abortions, except where the abortion is medically indicated to avoid endangering the life of the mother if the fetus were carried to term."

Read in this sense, the claim advanced is that the Hyde Amendment is unconstitutional in respect to (a) females who are or may become pregnant, who are otherwise eligible for medical and hospital services for pregnancy under the Medicaid laws, and

who desire abortions for which the appropriation act does not appropriate federal funds by virtue of the Hyde Amendment; (b) physicians who provide abortions to pregnant females desiring them and who receive payment therefor under the Medicaid laws; (c) the Planned Parenthood of Hudson County, Inc., (PPHC), a N.J. non-profit corporation, which operates a clinic (the Hudson Health Center) at which first trimester abortions are performed, and which receives payment therefor under the Medicaid laws.

On behalf of these 3 sets of plaintiffs, a total of 7 causes of action are set out in the complaint. These subdivide as follows:

For the plaintiff Jane Doe, the First, Second, Third, Fourth and Seventh causes of action assert that the restriction of the Hyde Amendment creates an invidious discrimination (as between one who can afford elective abortions without Medicaid and one who cannot); deprives her of the right to control her own person as well as of the rights of privacy and liberty in matters relating to marriage, sex, procreation and the family; coerces her (in future) to be irreversibly sterilized rather than risk a pregnancy that cannot be aborted; and constitutes an establishment of religion. These effects are claimed to violate the First, Fourth, Fifth and Ninth Amendments.

For the plaintiff physicians, the Fifth Cause of Action asserts that pregnant women consult them, and for many of such women they would, "in the exercise of their best professional judgment, concur in the women's decisions" to have an abortion performed and would so perform. The Hyde Amendment, as to physicians, is said to deprive them of their "right to practice medicine in accordance with their best medical judgment"; would deprive them of their right to give (and their patients to receive) "appropriate and adequate medical treatment and advice" relating to whether to terminate a given pregnancy; and would deprive them of their right to receive substantial income from abortion services rendered to Medicaid patients in violation of their right to receive fees for such services.

These effects are said to violate the First, Fourth, Fifth and Ninth Amendments.

For the plaintiff PPHC, the Sixth Cause of Action says that denial of reimbursement for abortions for Medicaid patients would prevent it from continuing its program for such services and deprive it from receiving fees therefor. This is said to violate the Fifth Amendment.

## OUTLINE OF THE MEDICAID PROGRAM

The complaint, the moving papers and the brief for plaintiffs focus on the challenges to the Hyde Amendment, with scant discussion of the structure and working of the Medicaid laws. Yet, to provide perspective to the claims made, some basic context of the law within which the particular and detailed conflict occurs is essential. What follows is the court's general understanding of that basic context.

The Medicaid law was passed in 1965 as a supplement (Title XIX) to the Social Security Act, 42 U.S.C. § 1396a. This enabling legislation contemplates a program under which the States may enact Medicaid statutes and adopt plans to pay for various kinds of health services (i. e., medical, hospital, dental, pharmaceutical, prosthetic, optometric, etc.), part of the cost of which is reimbursable to the States by the federal government.

No State is obliged to enact a Medicaid law or plan. If it does, it must at least enact a law to pay for Medicaid services to all persons eligible for welfare (categorical aid), the eligible services to meet a specified minimum enumeration. If a State enacts no Medicaid law, or enacts one not meeting the minimum Title XIX requirements, it is potentially not eligible for reimbursement of any of the costs of its own program.

A State may also elect to enact an expanded Medicaid law to provide payment for health services not only to benefit those eligible for welfare benefits, but also to others, not so eligible, who are medically indigent or needy; i. e., their income is too high to qualify for welfare benefits, but is

not high enough to be able to meet some kinds of health expenses. The kinds of services which a State may choose to pay for if it covers the medically needy is more flexible than those to be provided for those eligible for welfare benefits.

Obviously, the structure of the Medicaid program is one that is more limited than the kinds of publicly financed health programs that have been enacted in England and the Scandanavian countries, for example. Also, it is a program designed to stimulate the States, rather than the federal government, to adopt health care programs. The stimulus is the "carrot" of partial federal refunding. States might hesitate to enact a health services law by themselves in view of the potentially enormous cost, and the difficulty of administering and controlling problems of eligibility, utilization and the like. The receipt of a federal share to help meet the direct and administrative costs has induced some States to enact Medicaid laws. New Jersey is one of them, P.L.1968, c. 413, N.J.S.A. 30:4D–1 et seq.

Unlike the privately developed and operated health plans, such as the well-known Blue Cross/Blue Shield programs, the Medicaid program makes no general attempt to sign up in advance "providers" of services who agree to accept stipulated amounts or rates for stipulated services. The arrangement, rather, is more akin to indemnity health insurance, where the amount paid by the carrier is stipulated according to some standard or schedule (which is actuarially reflected in the premium), leaving it to the insured to find a provider of the services.

Such a system necessarily requires that a State which enacts a Medicaid law set up some rather sophisticated administrative machinery. The program involves the expenditure of public funds obtained from taxpayers at both State and national levels. The funds paid out may only be paid for the benefit of those who are eligible, for services that are authorized and in fact rendered, and in amounts that are proper. Some Medicaid programs are administered by the State with public employees. Others have contracted for administration with private carriers who are experienced and equipped to handle the work as an adjunct to their own highly similar work or to other contracted services for related programs such as Medicare.

In any event, an applicant for benefits is first found eligible by some designated agency of the State, is enrolled, and is issued some kind of identification card. When services are needed, the enrolled person seeks out a provider willing to accept the authorized Medicaid amount as full payment for the service, and receives the service. The provider then bills the State, through some administrator who reviews the claim and if found proper, pays it on behalf of the State. In turn, the State takes the data on paid claims to HEW as a basis for claiming reimbursement of the federal share.

At this writing, the court has not had furnished to it a copy of the law enacted by Congress, one part of which is challenged. It has been told that the Statute involved is the appropriations law for the new fiscal year October 1, 1976 through September 30, 1977, to which the Hyde Amendment was added as a "rider", it is said. The materials submitted do not reflect the legislative history. One reference indicates that the amendment became § 209 of "H.R. 14232." Another reference is to a Conference Committee Report on "H.R. 14323, attached hereto as Appendix A", but which is not attached at all.

Whether the Hyde Amendment is a "rider" (a term usually describing a provision of law unrelated or not germane to the bill to which it is attached) or a floor amendment, is by no means clear. In any event, whatever the legislative mechanism was, the challenged provision is claimed to have been passed by both Houses of the Congress, sent to the President who vetoed the entire bill, and enacted into law by a two-thirds vote of both Houses of Congress. The Constitution of the United States does not require the Congress to limit each Bill to one object, or to state that object in its title. It does not extend to the President the authority to veto one or more items in an

appropriations law, or to the Congress the authority to override the veto of one or more of such items. It does not authorize the mechanism of the conditional veto.[1] A bill either becomes law, as a whole, or it is no law at all.

What is significant about this analysis is that if it be true that the Hyde Amendment is part of the appropriations act for fiscal 1977, it is not an amendment of any part of Title XIX of the Social Security Act. The importance of this will become apparent.

## THE STATUS OF THE NEW JERSEY PROGRAM

As noted above, New Jersey has enacted a Medicaid law. It has also enacted legislation that precludes payment under the program for elective or non-therapeutic abortions, P.L.1975, c. 261, N.J.S.A. 30:40D–6.1.

Despite this provision, New Jersey was directed to continue making such payments under the terms of a preliminary injunction entered in the case of *Doe v. Klein*, Civ. No. 76–74 (GHB), U.S. District Court, District of N.J. (unreported). That preliminary injunction was issued in light of the decision in *Doe v. Beal*, 523 F.2d 611 (3 Cir. 1975), *cert. granted*, 1976, —— U.S. ——, 96 S.Ct. 3220, 49 L.Ed.2d 1216. The *Beal* case involved a parallel restriction in the Medicaid law of Pennsylvania, and the ruling of the Court of Appeals was grounded on the proposition that, having elected to enact a Medicaid law, the exclusion of abortion services was not among the options available to Pennsylvania. The Court of Appeals explicitly chose to reach its decision on statutory construction grounds rather than on constitutional grounds, on the long-established principle that constitutional issues are not reached in any case where the matter can be decided on other grounds.[2]

The statute relied on by the Court of Appeals in *Beal* was the Medicaid law, Title XIX of the Social Security Act, 42 U.S.C.

§ 1396a. That statute was not amended or affected by the Hyde Amendment. Title XIX remains in force, as it stood when *Beal* and *Klein* was decided. The Hyde Amendment affects the federal appropriation to HEW for fiscal 1977, and its application is limited to the treatment of items of cost incurred by a Medicaid State for which federal funds can be paid to that State. It has no application to the kinds of items for which a State must pay if it has enacted a Medicaid law.

For this reason, as well as for the reason that the preliminary injunction in *Doe v. Klein* has not been modified, the N.J. Commissioner of Institutions and Agencies (Klein), who presumably administers New Jersey's Medicaid law, remains obliged to continue to pay for medical, clinic and hospital services for elective abortions, even though New Jersey may not be entitled to receive federal fund support for the costs incurred under the general appropriation law, if the Hyde Amendment is valid.

Alternatively, it is open to Commissioner Klein to advance the argument that denial of a federal share payment for these costs under the Hyde Amendment provides a basis for lifting or modifying the preliminary injunction issued in *Doe v. Klein*. The court can only note this potential issue. It cannot deal with it because Commissioner Klein is not a party to the suit.

Plaintiffs could have sought leave to file a supplemental complaint in *Doe v. Klein*, to advance the challenge to the Hyde Amendment, to bring in at least Secretary Mathews of HEW as an additional party, and to advance alternative claims (a) that the Hyde Amendment is unconstitutional and (b) that even if valid, Commissioner Klein remains obliged to pay for elective abortions even though the federal share is cut off, on the theory that Title XIX remains in full force and effect.

1. See, for example, N.J.Const., 1947, Art. 4, § 7, par. 4 (single object and title); Art. 5, § 1, par. 15 (line item veto of appropriation bills); Art. 5, § 1, par. 14(b)(3) (conditional veto).

2. The Court of Appeals followed the policy indicated by the Supreme Court in *Hagans v. Levine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Westby v. Doe*, 420 U.S. 968, 95 S.Ct. 1385, 43 L.Ed.2d 648 (1975).

Plaintiffs chose to file an independent suit, to which Commissioner Klein is not a party. Since the basic obligation to pay for Medicaid services is evidently a State obligation, under the pattern of the law, the failure to join Commissioner Klein leaves out an indispensible party. This litigation strategy also has the effect of attempting to compel the court to deal with a constitutional claim when the underlying right of all the plaintiffs might well be decided on statutory grounds, without reaching any constitutional issue, as it is bound by law to do if it can.

For the failure to join an indispensible party, no temporary restraining order can be granted.

## THE APPROPRIATIONS LAW ASPECT

In challenging the constitutional validity of the Hyde Amendment, plaintiffs rely on the ruling in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and a group of federal decisions concluding that States that adopt Medicaid laws must pay for the cost of elective abortions, at least for those eligible for categorical aid. Some of these decisions are said to rest on constitutional grounds, while others rest on statutory construction of the Social Security Act.

One of these, *Klein v. Nassau County Medical Center*, 347 F.Supp. 496 (E.D.N.Y.,1973) was vacated and remanded, 412 U.S. 924–5, 93 S.Ct. 2747, 37 L.Ed.2d 151, for reconsideration in light of *Roe* and *Doe*. The decision after remand is in 409 F.Supp. 731 (E.D.N.Y.,1976), and appeal was docketed May 27, 1976 as No. 75–1749. Another is *Roe v. Norton*, 408 F.Supp. 660 (D.Conn. 1975), prob. juris. noted July 6, 1976 as *Maher v. Roe*, —— U.S. ——, 96 S.Ct. 3219, 49 L.Ed.2d 1216. The third is *Doe v. Beal,* in this circuit, 523 F.2d 611 (CA–3, 1975), *cert. granted* 1976, —— U.S. ——, 96 S.Ct. 3220, 49 L.Ed.2d 1216. The fourth is *Doe v. Poelker*, 515 F.2d 541 (8th Cir. 1975), *cert. granted* 1976.

All of these cases, and others relied on as well, dealt with State restrictions on payment for elective abortions. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and its companion, *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), dealt with state statutes forbidding the performance of abortions as such. The statutes of some states, such as New Jersey, were left open to a saving construction to meet the tests of *Roe v. Wade.* See, e. g., *USA ex rel. Norflett v. Hilton*, Civ. No. 75–1121 (D.N.J. 6/29/75) (not reported).

In any event, *Roe* and *Doe* did not touch the question whether a State legislature which enacts a health services law (whether under Title XIX or not) may choose not to include elective abortions among the eligible kinds of services. Even the cases which dealt with Medicaid statutes seem not to have considered the question whether the exclusion of payment for these services made the State itself ineligible for any federal share for failure to match the minimum standards of Title XIX. Such ineligibility is obviously one possible result, but the question probably was not reached in those cases, as it was not reached in *Doe v. Beal*, because there was no federal party brought in to raise the issue. Other adversely affected persons, under such an analysis, would also need to be made parties.

Also, none of the cases relied on deal with one obvious question raised by the challenge to the Hyde Amendment, namely, the impact of the provision, in U.S.Const., Art. I, § 9, cl. 7 that:

> "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

Neither the complaint, the moving papers nor the initial brief discusses this question. Yet, it cannot be avoided because, on the record before the court, the Congress simply has not appropriated any moneys for fiscal 1977 to reimburse Medicaid States with a federal share for elective abortions.

For this question, a declaratory judgment that the Hyde Amendment is unconstitutional, or enjoining Secretary Mathews of HEW from enforcing it, or both (as asked by the complaint) would be a futile and meaningless judgment. This is because of

the fact that if Secretary Mathews were to ignore the Hyde Amendment pursuant to such a judgment, the Secretary of the Treasury would remain bound to observe the Hyde Amendment and to refuse to draw any moneys out of the Treasury for payment of a federal share to a Medicaid State on account of elective abortions. The Secretary of the Treasury is not a party to this suit and would not be bound by the court's judgment here.

Even if the Secretary of the Treasury were joined as an indispensible party for the remedy sought, a serious question arises whether any court can direct him to draw moneys from the Treasury when there is no appropriation made by law.

This clause was long ago held to be a restriction on the executive officer of the Department of the Treasury. It does not prevent the Congress from creating a liability on the part of the United States, as by Title XIX of the Social Security Law, although that liability may not be satisfied until there is an appropriation for the purpose. See, *Knote v. U. S.*, 95 U.S. 149, 24 L.Ed. 442 (1877). Similarly, it has been held that the clause does not prevent the Congress from indicating some class of persons who are not to be paid out of a general appropriation but who need to come to the Congress for relief. See *Hart's Case*, 16 Ct.Cl. 459, aff'd, *Hart v. U. S.*, 118 U.S. 62, 6 S.Ct. 961, 30 L.Ed. 96 (1886).

Under these precedents, it may be that there is no constitutional question at all, since it may have been the intention of the Congress not to make a general appropriation to reimburse Medicaid States with a federal share toward the cost of elective abortions, and instead may have wished to withdraw that determination from HEW and reserve it to itself on the application of a Medicaid State to be so reimbursed by an appropriation law other than a general one.

■ Thus, the limitation of the Hyde Amendment on the general appropriation law for HEW for fiscal 1977 in no way exhausts the power of the Congress to pass a law appropriating moneys out of the Treasury to reimburse New Jersey.

Whether such a claim by New Jersey should be recognized and paid or not seems to be a question for Congress alone to determine. If it should so direct payment, neither the Secretary of the Treasury nor any court has any voice to say whether or not it shall be paid. *U. S. v. Price*, 116 U.S. 43, 6 S.Ct. 235, 29 L.Ed. 541 (1885); *U. S. v. Realty Co.*, 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215 (1896); *Allen v. Smith*, 173 U.S. 389, 19 S.Ct. 446, 43 L.Ed. 741 (1899).

■ Similarly, it has long been the law, as it must be in light of the clear and explicit language of the constitution, that no officer may pay an obligation of the United States without an appropriation for that purpose, and no mandamus may issue to that end. *Reeside v. Walker*, 11 How. 272, 52 U.S. 272, 13 L.Ed. 693 (1851); *Collins v. U. S.*, 15 Ct.Cl. 22 (1879); *Contracts of Extension of Capitol*, 6 Op.Atty.Gen. 28 (1853).

At the oral argument, the court raised the question whether, if the claim were sound, the remedy sought was appropriate in light of this constitutional restriction on the Treasury.

The court called attention then to the highly analogous situation in *Robinson v. Cahill*, 70 N.J. 155, 358 A.2d 457 (1976). There, the Supreme Court of New Jersey was faced with the problem of finding a constitutional vehicle for providing a remedy to carry out its underlying ruling that existing State arrangements for funding the free public schools did not comply with State constitutional requirements. Recognizing that it could not appropriate money (N.J.Const.1947, Art. 8, § 2, par. 2 contains a provision essentially the same as that involved here), it entered an order directing that no State, county or local official was to expend *any* moneys for the free public schools until the legislature had appropriated funds conforming to the standards laid down by the underlying ruling.

This order did not impair existing contractual obligations, nor did it preclude making new obligations. It could not, without running afoul of several other constitu-

tional constraints. In practical effect, the order "closed the schools", though in law it did not. School employees and others under contract were free to report for duty or render their services, and thus earn their right to compensation. They could not be *paid*, while the order was in effect, but they could recover judgments to establish their right to payment.

If a court has the power to hold a provision of an appropriation law unconstitutional, and if the Hyde Amendment is subject to such a ruling, it may be that the only remedy a court can provide is to enter an order like that in *Robinson v. Cahill*. The point is a novel one on the federal scene, and the remedy is one not to be granted lightly or "routinely". If it is to be granted at all, then before making any decision on the point there should be parties before the court to represent and speak for those who would be adversely affected and disadvantaged by a judgment that no federal funds are to be drawn from the Treasury to reimburse Medicaid States for any costs incurred under their Medicaid laws until funds are appropriated for elective abortions.

The *Robinson v. Cahill* order initiated a constitutional confrontation whose reverberations will echo for decades to come. Such confrontations erode the foundations of the constitutional structure in ways and to an extent that no one can forecast. The judicial branch, in particular, being that branch which decides issues of constitutional law in the last resort, is exposed to the greatest risk of all the branches if it goes too far; if it goes beyond that indefinable line where its judgment has no force and cannot be carried out. And, if it attempts to design a remedy like that in *Robinson v. Cahill*, it may find that it has destroyed the pattern of accommodation between the branches of government upon which the working of government depends. The doctrine of separation of powers in no way prevents all three branches from pulling together toward the same common goal. But when the three branches pull apart in separate and different directions, the structure of government itself is at risk.

■ The constitutional question raised by plaintiffs involves a conflict, for this reason, with another constitutional provision which is itself clear and explicit, and for that reason, a temporary restraining order is denied.

## THE CONSTITUTIONAL ISSUE

The fundamental basis for this suit is an "equal protection" claim, based on the Fourteenth Amendment, and that this applies to the United States through the due process clause of the Fifth Amendment. It amounts to saying that if health services for pregnancy are to be paid for at all, no legislative body may allow payment for some and not for others. The claim is essentially one of invidious discrimination.

The presentation made so far does not address the question whether the alleged discrimination is "per se", calling on the defendant to demonstrate a compelling governmental interest in the tenor of the challenged law, or whether it falls into the "all other" category, for which any rational basis that might be thought of for the distinction made will suffice to support it.

At this stage, the court has no facts. It has a pleading from one side, some affidavits and a brief. None of them addresses this question, which goes mainly, of course, to the burden of persuasion.

Recognizing this handicap, the court observes that the major theme of the record so far is that the Hyde Amendment confronts first-trimester pregnant females otherwise eligible for Medicaid with no choice at all. The brief claims that for 85% of the cases of first-trimester abortions, the cost averages $150. nationwide, and for the second trimester, averages $350. nationwide. For those otherwise eligible for Medicaid who do not have these funds, if the Hyde Amendment has the effect claimed, such pregnant females will carry to term and some number will deliver a live child which they did not want to bear.

Since the reproductive process in the human female involves a period of gestation which no man-made law has so far been able to change, it is obvious that at least two classes of pregnant females is involved: one, consisting of those who became pregnant before the Hyde Amendment was enacted, and two, those who become pregnant thereafter.

Since the human period of gestation is roughly 9 months, an argument can be made for those eligible who became pregnant back to December 31, 1975 at the outside. Those who were not pregnant on October 1, 1976 may be a separate class, as they are on notice of the possible effect of the Hyde Amendment.

Some of the contentions advanced are based on the proposition that the Hyde Amendment reflects a denial or restriction of choice, at least for those not now pregnant but who may become pregnant, between being coerced into carrying a fetus to term or undergoing an irreversible sterilization.

Subject to proofs at trial, the choice does not appear likely to be that stark or extreme. Unlike such ailments as the common cold, measles, mumps or swine flu, pregnancy is, of itself, neither an ailment nor a disease, but rather is a possible consequence of a male-female sexual encounter. Putting aside continence as a means for avoiding pregnancy, at least in a realistic sense since Adam and Eve left the Garden of Eden, the human female today has a number of choices of ways to avoid pregnancy, while engaging in sexual encounters, and thereby eliminating any need for abortion, which only arises if pregnancy ensues.

Certainly, five means for avoiding pregnancy are known widely enough to be the subject of judicial notice. These involve the use of (1) a male prophylactic, (2) a diaphragm, (3) an intra-uterine device, (4) contraceptive medications (the "pill"), and (5) the "rhythm" method. The first of these may be used in combination with any of the other four so as to reduce the risk of pregnancy to its potential minimum.

Nowhere in the present record is it suggested that the Hyde Amendment forecloses any of these choices. In fact, as drawn, the papers imply some kind of constitutional right to become pregnant and then to be aborted. The question is hardly that simple.

■ Nothing dealing with the complex aspects discussed here, and nothing dealing with the right of the Congress not to appropriate funds for some purpose or another has ever been the subject of a ruling by an upper court. For this reason, the temporary restraining order is denied.

### THE CLASS ACTION ASPECT

■ Jane Doe seeks to represent a class. As noted at the hearing of October 1, 1976, Doe will be allowed to prosecute the suit anonymously, *Doe v. Deschamps,* 64 F.R.D. 652 (D.Mont., 1974), but subject to full disclosure of facts, under seal, to permit testing of such questions as eligibility, standing, representation, definition of the class, and so on.

The physician plaintiffs also seek to represent a class, but as set out in the complaint, the definition of the class is not sufficiently clear.

The court is also aware from the oral argument that similar suits have been filed in the Eastern District of New York, and in the District of Columbia. Others may well be filed elsewhere.

At this early stage, it seems prudent not to attempt to define or certify either of the proposed classes or any sub-classes. A class may be certified in another action, on a basis broad enough to encompass the named plaintiffs and the classes they seek to represent here. If so, an overlapping of classes in two or more courts can only lead to confusion and a duplication of the severely limited amount of judicial time and effort available. Accordingly, no class action certification will be made until that aspect is ripe for decision.

### SECURITY UNDER RULE 65(C)

■ F.R.Civ.P. 65(c) requires the giving of security, in such sum as the court deems

proper, as a condition to the issuance of a temporary restraining order. The security is to be provided by the applicant, and is to cover payment of such costs and damages as may be incurred or suffered by any party found to have been wrongfully restrained.

In this case, the basis or formula for security would consist of whatever sums are barred from withdrawal from the Treasury by the Hyde Amendment which plaintiffs seek to have paid under the restraining order, and interest thereon. Costs of suit would be negligible on a relative basis.

In terms, the rule is mandatory. If there be judicial discretion not to require security, such discretion cannot be exercised here. The issue involves not only the constitutional claims advanced by plaintiffs, but an explicit and contrary constitutional restriction on the drawing of money from the Treasury without appropriation made by law. If, through means not now foreseeable, it is possible to compel the money to be drawn from the Treasury, then, if in the end it proves that plaintiffs are wrong, they will have to pay the money back.

No tender of security is made in the complaint or moving papers. The suggestion at oral argument that security is required was met by a claim of inability to provide it. That claim might be true of the plaintiff Doe, but explicit and certified financial data would need to be provided for PPHC and the physician plaintiffs (particularly if the requested class is certified) before that claim could be considered as to them.

The physicians are not claimed to render their services on a non-profit basis, particularly if the class is certified, and so should be expected to post security for repayment if it turns out that they are wrong.

For this reason, the application for a temporary restraining order is denied.

## CONCLUSION

Each of the reasons given in this opinion is an independent reason for denying a temporary restraining order. The denial is without prejudice to the application for pre-liminary injunction on return of the order to show cause. In addition, plaintiffs may find it prudent to amend the complaint and bring in additional parties, as noted above. Leave to file an amended complaint on or before December 6, 1976 is granted. The time within which to answer or otherwise move in respect to the complaint is extended accordingly.

The order to show cause for preliminary injunction is granted, but without provision for a temporary restraining order.