119 N.J. Super. 40 (1972)
289 A.2d 569
KENNETH ROBINSON, ETC., ET AL, PLAINTIFFS,
v.
WILLIAM T. CAHILL, ETC., ET AL, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 30, 1972.
*41 Mr. Harold J. Ruvoldt, Jr., for plaintiffs (Messrs. Ruvoldt and Ruvoldt, attorneys).
Mr. Stephen G. Weiss, special counsel, for defendants (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
BOTTER, J.S.C.
Following the filing of my opinion in this case on January 19, 1972, and reported in 118 N.J. Super. 223, counsel for defendants asked leave to be heard on the form of judgment to be entered and specifically moved (by letter of February 2, 1972, and orally on February 4, 1972) to postpone certain operative dates fixed by the court in that opinion, namely, the January 1, 1973 date and the January 1, 1974 date. The date suggested by the Attorney *42 General for legislative action was two years from the conclusion of an appeal to the New Jersey Supreme Court, or, in any case, not earlier than January 1, 1974. In my written opinion I had provided that all operations under existing school laws and tax laws shall continue. I further provided:
To allow time for legislative action, such operations shall not be enjoined prior to January 1, 1974, except that if a nondiscriminatory system of taxation is not enacted by January 1, 1973, then from and after that date no state monies shall be distributed to any school districts pursuant to the `minimum support aid' provisions and the save harmless provisions of the Bateman Act (L. 1970, c. 234) which have been identified previously in this opinion. All funds that are thereby set free shall be distributed by appropriate state officials in a manner that will effectuate as far as possible the principles expressed herein; more specifically, these funds shall be applied to raise guaranteed valuations to the highest level that a proportionate distribution of funds will permit, utilizing the remaining provisions of the Bateman Act. [118 N.J. Super. at 280-281]
On the motion to settle the form of judgment I denied the motion of the Attorney General for a change in these dates. However, in the judgment entered I added to the portion of the opinion quoted above the following:
Provided, however, that no such distribution of minimum aid and save harmless funds shall be made without further order of this court, and, in any event, the Commissioner of the State Department of Education, State of New Jersey, on or before November 15, 1972, shall formulate and submit to this court for approval a plan for the effectuation of this provision prior to putting it into effect; and provided, further, that the State Board of Education and/or the Commissioner of the Department of Education, State of New Jersey, may propose an alternate plan or plans for the use or distribution of said minimum support aid and save harmless funds to effectuate the principles expressed in the written opinion of this court in the event this injunction shall become operative, said plan or plans to be submitted on or before November 15, 1972.
At oral argument the Attorney General contended that the January 1, 1973 date for the possible cut-off of minimum aid to certain school districts presented practical difficulties. He did not contend that any school district would be legally *43 unable to obtain funds to replace the minimum aid loss that may occur. I denied the motion, with leave to the Attorney General to file a brief or letter memorandum specifically indicating whether it was his position that the statutory scheme would make it legally impossible for some school districts to obtain sufficient funds through usual budget appropriations and procedures to make up for the loss, if any, of minimum aid revenues from the State.
By letter of February 17, 1972 I again requested that the Attorney General advise me of his position on this point. I received a reply on or about March 2, and thereupon advised counsel that I intended to write a supplemental opinion on the subject and requested plaintiffs' attorney Ruvoldt to expedite his reply. He presented his position by letter of March 20.
I interpret the Attorney General's position to be that the withholding of certain state aid would leave a municipality with inadequate revenues raised by normal tax procedures between January 1 and June 30, 1973, and that this deficit would not be made up by taxes collected until the latter half of 1973. Nevertheless, any municipality whose expenses for the first half of any calendar year exceed tax revenues received during that period may borrow the additional money needed in anticipation of taxes to be received in the second half of the calendar year. This problem, when it exists, is not unique. It may occur because of increases in municipal and county expenses, as well as other reasons, such as the loss of anticipated federal aid or unusual reductions in ratables or in tax collections for a given period.
Under Title 40A, which includes the Local Budget Law (Chapter 4), the fiscal year is defined as "the calendar year beginning on January 1 and ending on December 31." N.J.S.A. 40A:1-1. Municipalities adopt budgets for a calendar year and these budgets are transmitted to the county board of taxation no later than March 31 of each year. N.J.S.A. 40A:4-11.
N.J.S.A. 40A:4-12 provides as follows:
*44 The amount to be raised by taxation, as stated in the county budget, shall be the amount to be raised by taxation for county purposes. The amount to be raised by taxation, as stated in the municipal budget, shall be the amount to be raised by taxation for municipal purposes and for school purposes where school district costs are required to be included in the municipal budget. These taxes shall be assessed, levied and collected within the respective taxing districts in the manner prescribed by law.
N.J.S.A. 40A:4-13 provides as follows:
The amount to be raised by taxes for school purposes, required to be certified to the governing body of a municipality for inclusion in its budget, shall be set forth in a separate section of the budget upon adoption and shall be added to the amount to be raised by taxes for school purposes, if any, which were included in the approved budget upon the final adoption of the budget, or it may be omitted from the budget as approved and may be added to the budget, by resolution, on final adoption without public advertisement.
N.J.S.A. 40A:4-14 provides as follows:
In making the certifications of the budget for transmission to the county board, the amount to be raised by taxes for school purposes by a municipality shall be separately stated and
a. In municipalities in which the amount to be raised by taxes for school purposes is required to be certified to the governing body for inclusion in its budget, there shall be deducted from the `municipal tax levy'
1. The amount appropriated for debt service after first deducting therefrom the amount of the State school building aid, if any, and
2. the amount of any emergency appropriation for school purposes certified to the municipality and approved by the governing body thereof;
3. the amount appropriated for school capital improvements for land, buildings and equipment.
b. In all other municipalities, there shall be deducted from the municipal tax levy any appropriations for school purposes required.
Said items shall be added by the county board to the amounts to be raised by taxation for school purposes.
Following receipt of the municipal budgets, the county board of taxation, on or before April 10, completes a table of aggregates which includes, among other items, total ratables, the amount of county, municipal and district school *45 taxes, and the tax rate for local taxing purposes. N.J.S.A. 54:4-52.
N.J.S.A. 18A:36-1 provides:
The school year for all schools in the public school system shall begin on July 1 and end on June 30.
Under N.J.S.A. 18A:22-14 the board of school estimate in a Type I school district must fix the school budget no later than February 15 of each year for the ensuing school year. That budget includes current expenses, anticipated revenues, the amount available from a surplus account and the amount of state aid anticipated. N.J.S.A. 18A:22-8. The board of school estimate determines the amount of money to be appropriated for public schools "for the ensuing school year, exclusive of the amount which shall have been apportioned to it by the (state) commissioner * * *." N.J.S.A. 18A:22-14. In a Type II school district, without a board of estimate, a school budget is adopted by the board of education no later than February 1. N.J.S.A. 18A:22-32. By submission of the budget to the electorate the voters determine the amounts to be raised "by special district tax for said purposes" and this sum, together with interest and debt redemption charges, is certified to the county board of taxation on or before April 1, and such amounts "shall be included in the taxes assessed, levied and collected in the municipality or municipalities comprising the district for such purposes." N.J.S.A. 18A:22-33.
The written opinion of the court in this case, which received widespread notice throughout the State, was handed down January 19, 1972. I assume, however, that school budgets adopted and submitted by April 1, 1972 did not anticipate the possibility of some districts losing minimum state aid or "save harmless" aid. Nevertheless, the amounts to be raised by local taxes in the 1973 calendar year for school purposes will be known on or about January 1, 1973. By then we will know whether the Legislature has acted or *46 not. Certain districts will then know if they will not receive minimum aid or "save harmless" aid that they had anticipated receiving for the period January 1, 1973 to June 30, 1973.
In both Type I and Type II school districts the amounts certified to the county board of taxation to be raised by local taxes for school purposes excludes anticipated state aid. Accordingly, if state aid is withheld from some districts, the amount of revenues to be raised by local taxes during the first half of 1973 will be insufficient in those districts to pay all school costs in budgets adopted early this year unless the amounts certified to the county board of taxation are increased. Counsel for the parties agree that in a Type I school district an additional appropriation of funds can be voted by resolution of the board of education in case of an emergency arising since adoption of the budget. N.J.S.A. 18A:22-21(3). When certified by the board of school estimate, funds must be appropriated by the municipal governing body. N.J.S.A. 18A:22-22 and 23. See Newark Teachers Ass'n v. Board of Education, Newark, 108 N.J. Super. 34, 46-48 (Law Div. 1969), aff'd 57 N.J. 100 (1970). Actually, what is involved is not an increase in the total budget for school purposes, but rather the need to increase the amount certified to the county board of taxation to be raised by local taxes. The same applies to a Type II district. There, although the total budget for 1972-73 has been voted upon and approved by the electorate, it is fair to construe N.J.S.A. 18A:22-33 to say that the public has voted primarily to determine the amount of money to be raised by local taxes. In a Type II district, under N.J.S.A. 18A:22-40 and 41, to raise "additional sums of money, over and above the amount fixed and determined in the last annual school budget, by special district taxes," the board of education must determine the amount needed and that amount must be submitted to the voters at a special school election. If approved, a local board of education is authorized to borrow money for these purposes and to issue promissory notes *47 maturing not later than December 31 of the year in which taxes are to be raised for the additional sums required. N.J.S.A. 18A:22-42. This procedure must be completed before April 1 so that the additional amounts certified to the board of taxation may be raised by taxes in that year. N.J.S.A. 18A:22-43.
Municipal taxes are payable on February 1, May 1, August 1 and November 1. N.J.S.A. 54:4-66(a). The first two installments of taxes are each one-fourth of the total tax levied against the same property in the preceding year, and the last two installments constitute the full tax for the current year minus the first two installments. N.J.S.A. 54:4-66(c). A municipality must pay local school taxes when due and must borrow sufficient money, if necessary, to pay such taxes. N.J.S.A. 54:4-76. N.J.S.A. 40A:4-64 authorizes a municipality to borrow money and issue notes in anticipation of the collection of taxes for that year. See also N.J.S.A. 40A:4-46 et seq., dealing with emergency appropriations and borrowing.
Although the total school budgets for July 1, 1972 to June 30, 1973 have been approved by public bodies and by the electorate (in Type II districts), I agree with the contention of the Attorney General that additional local revenues required because of a loss of state aid would have to be made up by added appropriations under the procedures mentioned above. This procedure would allow a board of school estimate where one exists, and the public (in a Type II district), to reconsider the total budget in the light of reduced state aid. The amount of minimum aid that may be lost in some districts for the period January 1 to June 30, 1973 is approximately $54 per pupil. Some districts may be able to raise the additional funds without borrowing. In some cases expenditures may be deferred administratively to a later time in the year when additional tax money comes in; and an increase in ratables in some wealthy suburban areas may produce additional revenues even in the first half of the tax year.
*48 In any case, the Attorney General apparently concedes that it will not be legally impossible for a school district to obtain sufficient funds when needed to operate schools following January 1, 1973 even if state minimum aid and save harmless aid is withdrawn from certain districts. Reviewing the budget by a board of school estimate, holding a special election in a Type II district, and borrowing money, where necessary, may be unwanted and inconvenient procedures. However undesirable this may be it need not come to pass if the Legislature acts in time. Moreover, the inconvenience and expense is small compared to the unfairness of giving substantial sums of school aid to wealthy districts with relatively low taxes while poorer districts in the State have inadequate school funds and high taxes. Accordingly, my previous decision, rendered orally, denying the Attorney General's motion for a change in dates is ratified.
Another point raised by the Attorney General on the motion to settle the form of judgment is the need to specify the specific provision of our State Constitution in which equal protection rights are afforded. In Robinson v. Cahill, 118 N.J. Super. 223, 270-271 (Law Div. 1972) Washington National Ins. Co. v. Board of Review, 1 N.J. 545, 553-554 (1949), was cited for the proposition that the right to equal protection resides in Art. I, par. 1 of our State Constitution. This view would appear to have been cited with approval in Bailey v. Engelman, 56 N.J. 54, 55 (1970). While the phrase "equal protection of the laws" is not used in the New Jersey Constitution, concepts of equality comparable to the rights of equal protection under the Fourteenth Amendment are derived from a number of provisions of our State Constitution. In General Public Loan Corp. v. Director, Div. of Taxation, 13 N.J. 393, 401 (1953), reference is made to Art. I, par. 1 and Art. IV, § 7, pars. 7, 8 and 9, as the "group of constitutional provisions * * * adverted to as the `equal protection' clauses." See also Robson v. Rodriquez, 26 N.J. 517, 526 (1958), where the court said that the "test of whether a law constitutes special legislation is essentially *49 the same as that which determines whether it affords equal protection of the laws." See also Alfred Vail Mutual Ass'n v. Borough of Shrewsbury, 58 N.J. 40, 52 (1971), where the court, in dealing with the reasonableness of classifications for legislative purposes, emphasized the requirement that the Legislature act "by general laws" contained in the concluding paragraph of Art. IV, § 7, par. 9.
Although my January 19 opinion dealt with equal protection rights, the concept that legislation must not be arbitrary and cannot contain unreasonable classifications, unnecessary or unrelated to appropriate legislative purposes, may also be expressed in terms of due process rights. See Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55, 70 (1960); Reingold v. Harper, 6 N.J. 182, 190-194 (1951).
My purpose here is simply to indicate that equal protection rights and the requirement for reasonable classifications germane to a legislative purpose are rights that are derived not only from Art. I, par. 1, but are common to other provisions of our State Constitution. It may be said that these rights find expression in our State Constitution so pervasive that they constitute the most fundamental and essential guaranty of that Constitution. This means that the Legislature cannot enact a system of education or taxation that prefers one individual or group of individuals over another without a reasonable basis for a distinction between them which is related to the purposes to be served. The right of each citizen of this State to a quality education cannot be inhibited by a legislative scheme that prefers some pupils over others and some taxpayers over others.
With these additional observations, the judgment entered by me on February 4, 1972 shall stand.