KENNETH ROBINSON, AN INFANT BY HIS PARENT AND GUARDIAN *AD LITEM*, ERNESTINE ROBINSON, *ET AL.*, PLAINTIFFS-RESPONDENTS, v. WILLIAM T. CAHILL, GOVERNOR OF THE STATE OF NEW JERSEY, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued March 15, 1976—Decided May 13, 1976.

*Mr. Lewis B. Kaden,* Special Counsel to the Governor, argued the cause for appellant Governor of the State of New Jersey (*Mr. Kaden,* of counsel and on the brief; *Ms. Judith Nallin, Mr. Arthur Winkler* and *Mr. Walter Bliss, Jr.,* Assistant Counsel to the Governor, on the brief).

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for appellants Treasurer of the State of New Jersey, Commissioner of Education of the State of New Jersey, New Jersey State Board of Education and State of New Jersey (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Skillman,* of counsel and on the brief; *Ms. Jane Sommer,* Deputy Attorney General, on the brief which was filed only on behalf of the Attorney General).

*Mr. David Goldberg* argued the cause for appellants President of the Senate of the State of New Jersey and the Senate of the State of New Jersey (*Messrs. Warren, Goldberg and Berman,* attorneys.)

*Mr. Jack Borrus* argued the cause for appellants Speaker of the General Assembly of the State of New Jersey and the General Assembly of the State of New Jersey (*Messrs. Borrus, Goldin and Foley,* attorneys).

*Mr. Harold J. Ruvoldt, Jr.* argued the cause for respondents (*Messrs. Ruvoldt and Ruvoldt,* attorneys and Special

Counsel to *Mr. Dennis L. McGill,* Corporation Counsel of the City of Jersey City, *Mr. Frank H. Blatz, Jr.,* Corporation Counsel of the City of Plainfield, *Mr. Joseph LaCava,* Corporation Counsel of the City of Paterson and *Mr. Julius Fielo,* Corporation Counsel of the City of East Orange).

*Mr. Paul L. Tractenberg* and *Mr. David G. Lubell,* a member of the New York bar, argued the cause for *amici curiae* Education Committee, Newark Chapter, National Association for the Advancement of Colored People and American Civil Liberties Union of New Jersey (*Messrs. Tractenberg, Lubell* and *Frank Askin,* attorneys; *Mr. Stephen Eisdorfer,* on the brief).

*Mr. William Zaino* argued the cause for *amicus curiae* New Jersey School Boards Association (*Mr. Zaino,* attorney; *Mr. David W. Carroll,* on the brief).

*Mr. Cassel R. Ruhlman, Jr.* argued the cause for *amicus curiae* New Jersey Education Association (*Messrs. Ruhlman and Butrym,* attorneys).

*Mr. Andrew T. Berry* argued the cause on behalf of *amici curiae* Township of Livingston and the Boards of Education of the School Districts of Montclair, Berkeley Heights, Chatham Township, New Providence, Rumson, Sandyston-Walpack, Summit and Millburn; *Mr. Berry,* of counsel; *Mr. Arthur F. Dicker III,* on the brief).

*Mr. Robert T. Pickett* and *Mr. David C. Long,* a member of the Illinois bar, argued the cause for *amicus curiae* The Education Reform Project of The Greater Newark Urban Coalition (*Messrs. Pickett and Jennings,* attorneys; *Mr. Pickett,* of counsel and on the brief; *Mr. Long,* on the brief).

*Mr. James L. Wilson* argued the cause for *amici curiae* Boards of Education of the Township of Bass River, Town-

ship of Eagleswood, Township of Long Beach Island, Borough of Tuckerton and Pinelands Regional School District.

*Mr. Alfred W. Kiefer* argued the cause for *amicus curiae* Board of Education of the Borough of Hasbrouck Heights (*Messrs. Kiefer, Bollermann and Kaplowitz,* attorneys).

*Mr. William DeLorenzo, Jr.* argued the cause for *amicus curiae* Board of Education of the Borough of Little Ferry.

*Mr. Arthur J. Sullivan* argued the cause for *amicus curiae* City of Clifton.

*Mr. Morton Feldman* submitted a brief on behalf of *amici curiae* Pleasantville Taxpayers Association, Weymouth Taxpayers Association, Association of Concerned Citizens of Vineland and Gilbert Cramer.

*Mr. Bertram E. Busch* submitted briefs on behalf of *amici curiae* Boards of Education of the Township of North Brunswick and the Township of Monroe (*Messrs. Busch and Busch,* attorneys).

*Mr. Joseph A. Hallock* submitted a brief on behalf of *amicus curiae* Board of Education of Lincoln Park (*Messrs. Hoffmann, Fiorello and Hallock,* attorneys).

*Mr. Jeffrey L. Reiner* submitted a letter memorandum on behalf of *amicus curiae* Morris School District (*Messrs. Meyner, Landis and Verdon,* attorneys).

*Mr. Howard Butensky* submitted a letter memorandum on behalf of *amicus curiae* Little Egg Harbor Township (*Messrs. Kelly and Butensky,* attorneys).

*Mr. Henry B. Kessler* submitted a memorandum on behalf of *amicus curiae* Burlington County Special Services School District.

Mr. *Joseph A. Maressa* submitted a statement on behalf of *amicus curiae* Board of Education of Lower Camden County Regional High School District Number One (*Messrs. Maressa, Diadone and Wade,* attorneys).

PER CURIAM. On January 30, 1976, a majority of this Court sustained the facial validity of the Public School Education Act of 1975 ("the 1975 Act"), *L.* 1975, *c.* 212, *N. J. S. A.* 18A:7A–1 *et seq. Robinson v. Cahill,* 69 *N. J.* 449 (*Robinson* V). The enactment of this statute on September 29, 1975, was the culmination of several years of litigation and of activity by the other branches of government consequent upon the adjudication by this Court of the unconstitutionality of the provisions of previous statutes governing the financing of public schools. *Robinson v. Cahill,* 62 *N. J.* 473, 480 (1973) (*Robinson* I).

Our determination in *Robinson* V was reached on the assumption that "complete funding [would] be forthcoming to furnish the necessary means to put [the 1975 Act] into full operation" *Robinson* V, 69 *N. J.* at 454, n. 2, absent which funding that statute "could never be considered a constitutional compliance with the 1875 amendment to the New Jersey Constitution — adjuring the *legislative establishment* of a system of thorough and efficient education." *Id.* (emphasis supplied).

We retained jurisdiction and stated that if the Legislature did not provide for such funding by April 6, 1976, we would issue an order to show cause why certain specific or other relief, including injunctive relief, should not be mandated. We accelerated the issuance of the order, and briefs were submitted and argument was held. To date there has been no final legislative action funding the financial aid provisions of the 1975 Act.

The continuation of the existing unconstitutional system of financing the schools into yet another school year cannot be tolerated. It is the Legislature's responsibility to create a constitutional system. As we stated in *Robinson* I, *supra,*

62 *N. J.* at 520, "The judiciary cannot unravel the fiscal skein." The Legislature has not yet met this constitutional obligation. Accordingly, we shall enjoin the existing unconstitutional method of public school financing.[1]

We therefore order as follows:

On and after July 1, 1976, every public officer, state, county or municipal, is hereby enjoined from expending any funds for the support of any free public school. This injunctive order shall not apply to:

1. Payment of principal, interest and redemption of existing school bonds, anticipation notes and like obligations.

2. The cost of maintenance and security of school properties.

3. The payment of contractual obligations for capital construction, necessary repairs and like expenses necessary for the protection of school properties.

4. Contributions toward teachers' pensions.

5. Payment of existing obligations for Blue Cross, Blue Shield, social security and similar commitments.

6. Payment of all insurance premiums.

Further applications for clarification of this injunctive order may be made to the Court.

---

[1]We recognize full well, along with Justice Mountain, the compelling force of Professor Cox's assertion that an injunctive order is "no answer" to the dilemma created by legislative inaction. See *Cox, The Role of the Supreme Court in American Government* 95 (1976). But Professor Cox hastens to acknowledge that "[n]ot to act would be to recognize judicial futility." *Id.* He suggests that "[t]he Court will scarcely perform its historical function of protecting the individual in his relation with the State unless substantive constitutional rights and the processes of constitutional adjudication can be adapted so as retain vitality despite the difficulties of the new milieu." *Id.* at 98.

However our decision today may be characterized — and we pause to observe that injunctive relief, a traditional remedy, can hardly be thought of as the product of unwarranted judicial "activism" in light of the history of this litigation in contrast to the other remedies alluded to in our February 19, 1976, Order to Show Cause — our reluctance to issue it is far outweighed by the necessities of the situation before us.

This injunction will not become effective if timely legislative action is taken providing for the funding of the 1975 Act for the school year 1976-1977, effective July 1, 1976, or upon any other legislative action effective by that date providing for a system of financing the schools in compliance with the Education Clause of the Constitution.[2]

So ordered.

MOUNTAIN, J. (dissenting). A majority of the Court have now directed that unless full funding of the Public School Education Act of 1975, or other constitutional compliance, is forthcoming by June 30, 1976, any further expenditure of public funds for school purposes will be enjoined until such compliance eventuates. For the reasons set forth below, I dissent.

I

Underlying the question of school financing — with which the series of *Robinson* opinions has been chiefly concerned — exists a far more important issue of constitutionalism: to what extent, if at all, should courts affirmatively intrude to

---

[2]It might be noted that Professor Cox delineates four possible remedies (none of which we pass upon presently as to possible constitutionality) which a legislature might adopt to finance public education:

Should public school education be centrally financed out of State revenues? Or should the State adopt the ingenious "district power-equalization" scheme, under which a district with a tax base per pupil above the State-wide average would contribute part of the school revenues it chose to raise to districts whose tax base per pupil was below the State-wide average? A third possibility might be to redraw school district lines to equalize the tax bases. A fourth would be to remove commercial, industrial, and mineral property from the local tax rolls, tax this property State-wide and use the proceeds to equalize inequalities resulting from the disparities in the remaining local tax bases. From a [federal] constitutional standpoint it would not matter what choice was made [so long as the constitutional objective was achieved]. [*Cox, supra*, n. 1, at 94-95].

rectify perceived instances of unconstitutional conduct which under our system of government should be corrected by one or other of the political branches of government — the executive or legislative. This is the issue we face here. This Court decided in *Robinson* I, 62 *N. J.* 473 (1973), that the system of financing public education in this state violated *Article* 8, § 4, ¶ 1 of the New Jersey Constitution which requires the Legislature to "provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." The Constitution places the obligation directly upon the *Legislature*. It is not diffused between or among two or more of the branches of government as are many constitutional obligations; it is imposed squarely upon *one* of the political branches.

It is the view of a majority of this Court that to this date there has not been legislative compliance with the constitutional mandate. The Court therefore faces the serious dilemma as to whether it should take further action to bring about compliance or stay its hand. Resolving the problem is not easy. This whole question as to the affirmative duty — if such it be — of the judiciary to compel compliance by other branches of government with requirements that have been determined by the judiciary to be necessitated by the Constitution, has been described by an eminent authority as "the next great challenge of American constitutionalism." *Cox, The Role of the Supreme Court in American Government* (1976) 98.

## II

Examined abstractly, powerful arguments can be presented to sustain each of the opposing viewpoints. In support of judicial restraint it may be pointed out that judicial activism, of the kind in which the majority has now engaged, generally results in violating accepted notions as to the doctrine of the separation of powers, *Robinson* IV, 69

*N. J.* 133, 174–184 (1975) (dissenting opinion). This doctrine finds explicit expression in our Constitution. *N. J. Const. Art.* III, ¶ 1.

Secondly, such judicial activism removes from the legislative body, which has been elected by the people, the opportunity to resolve the problem and gives that power to a small group of persons who have not been popularly elected. In considering this point it should not be overlooked that the same small group of persons will have been responsible for making the initial determination of unconstitutionality now invoked as the compelling reason for a further assertion of power.

In the third place the intrusion of the judiciary — regardless of alleged provocation — into areas of legislative or executive competence and concern places in serious jeopardy what has been called the Court's "power of legitimacy." Because Professor Cox has expressed this thought so well, I prefer to quote from his recent work rather than state the proposition in my own words. Although his remarks are addressed to the role of the Supreme Court of the United States, with only minor modification they apply equally to the highest court of each of the states:

The most important quality of law in a free society is the power to command acceptance and support from the community so as to render force unnecessary, or necessary only upon a small scale against a few recalcitrants. *I call this quality the 'power of legitimacy' because it appears to attach to those commands of established organs of government which are seen to result from their performance in an authorized fashion of the functions assigned to them. Such commands, and only such, are legitimate.*

The Judicial Branch is uniquely dependent upon the power of legitimacy when engaged in constitutional adjudication; and belief in the legitimacy of its constitutional decisions is therefore a matter of prime importance. The rulings thwart powerful interests. The issues arouse the deepest political emotions. Although the courts control neither the purse nor the sword, their decrees often run against the Executive, set aside the will of the Congress, and dictate to a State. Compliance results from the belief that in such cases the courts are legitimately performing the function assigned to them, and that it is important that the function be preserved. It was the power of legitimacy that produced the public outcry

which in turn compelled obedience when President Nixon announced hs intention to disregard Judge Sirica's order to produce the Watergate Tapes despite its affirmation by the Court of Appeals. It is to the same power that we must look to induce other branches of government to give support when necessary even to constitutional decisions of which they disapprove.

❊      ❊      ❊      ❊      ❊      ❊      ❊      ❊

The power of the Supreme Court to command acceptance and support not only for its decisions but also for its role in government seems to depend upon a sufficiently widespread conviction that it is acting legitimately, that is, performing the functions assigned to it, and only those functions, in the manner assigned. [*Cox, the Role of the Supreme Court in American Government, supra,* 103–05; emphasis added.]

Fourthly, the task of enforcement may often be beyond the competence of the Court for lack of supportive resources. The judiciary does not have, and was never intended to have, the staff and other resources needed to superintend and supervise the execution of complex and elaborately detailed decrees that would in effect be taking the place of legislative enactments or executive orders.

Finally, removing a matter from legislative or executive control may often result in most unfortunate side-effects. The Court may often be unable to view the governmental problem in its entirety and as a whole. For instance, in the case before us the obvious effort of the Court is to compel the raising of a very large amount of money and seeing that it is allocated to educational needs. Worthy as is this purpose, it takes no account of any number of other public needs of which the Legislature is acutely aware. Welfare, public health, needed renovation and construction of public facilities including correctional institutions, mass transit and essential increases in the wages and salaries of public employees, to name but a few, are also very worthy purposes. But revenues have some finite limit; there is a point beyond which taxpayer endurance cannot be expected to continue. If the judiciary seeks satisfactorily to resolve the problem before it, may not competing needs be forced to go unmet? The Legislature can, as it customarily does, take account of *all* public obligations, and allocate funds accordingly.

On the other hand it is pointed out that unless the courts will act, no one will act. This may or may not be true in a particular case, but the argument has much merit. On its face, at least, there seems no good reason why the citizens of the State should be asked to forego a constitutional right because of governmental inaction. Resort to the ballot box is a last and often ineffectual remedy.

## III

Consideration of the present case in the light of what has been abstractly stated above, convinces me that the action taken by the majority is most unfortunate. The Court has resorted to the equitable remedy of injunction. I have grave misgivings as to the wisdom of this step. This is no ordinary injunction. Its effect will be and is intended to be coercive. It is hoped that by threatening to close the schools this Court will induce the Legislature to raise and appropriate for educational purposes some very large sum of money. Thus the Court is indirectly commanding that a tax be imposed. But the taxing power is legislative and cannot be exercised by the judiciary. Should it seek to do indirectly what all readily admit it cannot do directly? It seems to be agreed that in all probability the money can only be raised by imposing an income tax throughout the state. Should the Court throw its great weight and influence in the scales, upon an issue so deeply controversial which has thus far met consistent legislative rejection? Of course the Legislature may, for whatever reason, fail to respond in the manner the majority must anticipate it will. What would happen then? As Professor Cox has said, speaking directly to this issue,

It is no answer to say 'shut down the schools and the legislature will do its duty.' [*Cox, supra,* at 95]

## IV

Mindful as I am of the importance of fulfilling the educational promise embodied in our organic law, I yet enter-

tain a strong hope and expectation that it will be brought about by our Legislature within a reasonable period of time. I cannot agree that the drastic and threatening action taken by the majority will ultimately prove beneficial to the people of this State or in the fullness of time be found to accord with the sound evolution of constitutional doctrine.

PASHMAN, J. (dissenting). The majority today enjoins the allocation or expenditure of any funds for the support of any free public school. If this order fails to compel the Legislature to raise sufficient revenues to fully fund the 1975 Act, it will then force the closing of all public schools in New Jersey on July 1, 1976. In issuing this order, it would be better if we could speak with a single voice. But I have no obligation to join in an undertaking which will bring education to a destructive standstill. I cannot join in any order which, even potentially, has such a self-defeating effect on public education. This result is as unacceptable as it is unthinkable. Even if instruction were to be resumed sometime within the year or in subsequent years, the very foundation and fabric of the State system of public education would be irreparably damaged. Rather than redressing persistent constitutional deficiencies in the present system of financing public education, the order exacerbates those deficiencies. Therefore, I must dissent from such an ill-considered and incredible disposition of this matter.

On September 29, 1975, the Public School Education Act of 1975, *L.* 1975, *c.* 212, codified as *N. J. S. A.* 18A:7A–1 *et seq.* (hereinafter the "1975 Act") was signed into law. It was enacted pursuant to the Legislature's constitutional obligation to provide a thorough and efficient system of instruction for all school children in the State.[1] More impor-

---

[1]Article VIII, § IV, par. 1 of the New Jersey Constitution of 1947, hereinafter referred to as the "Education Clause," provides:
The Legislature shall provide for the maintenance and support of a *thorough and efficient* system of free public schools for the

tantly, the 1975 Act was intended as a response to the existing constitutional infirmities identified by our courts in the current system of financing public education.[2]

On January 30, 1976, a majority of this Court sustained the facial validity of that Act. *Robinson V, supra,* 69 *N. J.* 449.[3] This holding was predicated upon the assumption that the 1975 Act would be fully funded for the 1976-1977 school year. *Robinson V, supra,* 69 *N. J.* at 454–467 n. 2. Accordingly, the Court retained jurisdiction for the purpose of issuing an appropriate remedial order if the Legislature failed to provide for full fiscal implementation of the Act. *Robinson V, supra,* 69 *N. J.* at 468. On February 19, 1976, when it appeared that such funding might not be forthcoming, we issued an order to show cause why one or more of several enumerated remedies should not be imposed. *Robinson VI,*

---

instruction of all the children in the State between the ages of five and eighteen years. [Emphasis supplied]

2The two opinions of the trial court are reported at 118 *N. J. Super.* 223 (Law Div. 1972) and 119 *N. J. Super.* 40 (Law Div. 1972). The several opinions and orders of this Court are reported at 62 *N. J.* 473 (1973) (hereinafter *"Robinson I"*) ; 63 *N. J.* 196 (1973) (hereinafter *"Robinson II"*) ; 67 *N. J.* 35 (1975) (hereinafter *"Robinson III"*) ; 69 *N. J.* 133 (1975) (hereinafter *"Robinson IV"*) ; 69 *N. J.* 449 (1976) (hereinafter *"Robinson V"*) ; —— *N. J.* —— (1976) (order to show cause of February 19, 1976, hereinafter *"Robinson VI"*).

3Nothing in that opinion precludes plaintiffs or any other individual or class of individuals adversely affected by this legislation from seeking appropriate judicial relief on the grounds that the 1975 Act as applied has failed to address the deficiencies enumerated in our previous opinions or to fully satisfy the constitutional mandate to which the State is bound. *See, e. g., Robinson V, supra,* 69 *N. J.* 449 *id.,* 69 *N. J.* at 470, 474–475 (Hughes, C. J., concurring). For a detailed description of such potential deficiencies see *id.,* 69 *N. J.* at 527–556 (Pashman, J., dissenting) and *id.,* 69 *N. J.* 449–476 (Conford, P. J. A. D., t/a, concurring and dissenting).

*supra,* —— *N. J.* at ——. The matter was heard before this Court on March 25, 1976.

At the outset, it should be noted that any order which provides less than full funding for the 1975 Act will be an inadequate remedial response to the current crisis. Clearly, without full funding, the constitutional deficiencies which were identified four years ago, will remain unremedied and unaddressed. Without full funding, the inexcusable deprivation of the constitutional rights of 1½ million New Jersey school children will persist into its fifth year. I agree with the majority that full funding is a constitutional requisite. This is entirely consistent with the position taken by this Court in *Robinson V* :

> We should and do proceed upon the assumption that complete funding will be forthcoming to furnish the necessary means to put the statute into full operation. The determination we reach — that the statute is facially constitutional — rests upon this assumption. Put more plainly, the 1975 Act, absent funding. could never be considered a constitutional compliance with the 1875 amendment to the New Jersey Constitution — adjuring the legislative establishment of a system of thorough and efficient education. [*Robinson V*, 69 *N. J.* at 454 n. 2]

In light of these pronouncements, it seems incredible to me that the majority of this Court has today issued an order which is tantamount to closing all public schools on July 1, 1976. I fail to see how this order can be reconciled with the important principles noted above to which the majority has previously and consistently adhered.

The distinction between "full funding" and "no funding" is obvious. Full funding of the 1975 Act, while not synonymous with satisfaction of the standard established by the Education Clause (*see* note 3 *supra*), nevertheless would go a long way toward achieving that goal. The injunction against all funding, by comparison, might effect an irreversible retreat to colonial times when public education — recognized by Thomas Jefferson as vital to both free government and

national progress[4] — was almost nonexistent. This would be an unfortunate legacy of the early history of our Nation to emulate in this Bicentennial year. Moreover, were public schools to close, the existing inequities in educational opportunity would only be exacerbated, since wealthy parents would undoubtedly find private means for providing educational instruction to their children. Thus, posing the threat of locked school doors on July 1, 1976 is an illogical and unacceptable solution to the school financing crisis. Finally, it is a remedy which both subverts the constitutional mandate of the Education Clause and undermines the hopes and desires of the school children of this State.[5]

Surely, the most appropriate solution to the problem of financing public education would be forthright action by the Legislature to appropriate sufficient funds to completely implement the 1975 Act. However, absent such action, this Court, "as the designated last-resort guarantor of the Constitution's command," must fill the void. *Robinson IV, supra,* 69 *N. J.* at 154–55. This Court has stayed its hand on numerous occasions during the course of this litigation.

---

[4]*Dumbauld, Edward,* ed., *The Political Writings of Thomas Jefferson,* 93–94 (Bobbs-Merrill, Indianapolis: 1955) containing editorial comment and selected writings; see also *Koch, Adrienne. The Philosophy of Thomas Jefferson,* 166–69 (Quadrangle Books, Chicago: 1964); *Brown, Stuart G.,* ed., *We Hold These Truths,* 114–16 (Harper & Brother, New York: 1941).

[5]It should be noted that the Court previously rejected this form of relief in *Robinson IV* due to its "harmful impact on vital educational programs":

We have given serious consideration to the idea of enjoining all State aid under the present unconstitutional system. That recourse would simplify the weighty problem of judicial power, as there is a concession by all that the Court may, and ordinarily should, enjoin the administration of a patently unconstitutional plan. But we are convinced that so radical a curtailment of obviously essential State assistance to the school districts and its consequent harmful impact on vital educational programs, even if only for one provisional year, is not justified at this time in the light of all pertinent considerations. [*Id.,* 69 *N. J.* at 147–48]

*Robinson I, supra,* 62 *N. J.* at 520–21; *Robinson II, supra,* 63 *N. J.* at 198; *Robinson III, supra,* 67 *N. J.* at 40; *Robinson V, supra,* 69 *N. J.* at 454–455. Even where it has acted, the Court has proceeded with utmost restraint and respect for the independence and integrity of the coordinate branches of government. *See, e. g., Robinson IV, supra,* 69 *N. J.* at 152–53, 154–55 and cases cited.

The action of the majority is now undertaken so that the Legislature may somehow hear the blast, feel the heat and see the light of its judicial edict. However, I am not willing to further entertain the ephemeral hope that legislative action will be forthcoming. I need only repeat what the United States Supreme Court concluded in *Griffin v. School Bd. of Prince Edward Cty.,* 377 *U. S.* 218, 229, 84 *S. Ct.* 1226, 1232, 12 *L. Ed. 2d* 256, 264 (1964) : "There has been entirely too much deliberation and not enough speed in enforcing the constitutional rights which we held . . . had been denied."

In light of these principles, I would enter the following remedial order:

(1) All local school budgets for the 1976-1977 school year are hereby set aside; all local boards of education shall reconsider their budgets on the assumption that the figures previously supplied by the Commissioner of Education for a fully-funded level of State aid under Chapter 212 are accurate, appropriate and effective. Each board shall, if necessary, readjust its budget to correlate with those figures. All local boards of education shall by May 28, 1976 submit their "revised" budgets to the Commissioner of Education who shall then review them. Where necessary, he shall consult with the local boards, order necessary adjustments and approve said budgets no later than June 18, 1976. (2) The Commissioner shall not approve any local school budget which eliminates an existing program or staff position maintained during the 1975-1976 school year unless the local board can demonstrate that said program or staff position

is not essential for the maintenance of a thorough and efficient system of education. The Commissioner shall not approve any local school budget which is less than the total adopted budget for 1975–1976 unless the local board can demonstrate to the Commissioner that said reduction will not impair the provision of a thorough and efficient system of education. The Commissioner shall not approve any local school budget whose increase over the total adopted budget for 1975-1976 appears to be exorbitant, unless the local board can demonstrate that said increase is necessary for the maintenance of a thorough and efficient system of education.[6] (3) After approval of all local school budgets, but not later than June 30, 1976, the Commissioner shall calculate an "average State school tax rate" by dividing the total of all school budgets for the entire State (reduced by any moneys appropriated by the State Legislature for school aid) by the total equalized assessed valuation of all ratables within the State. The Commissioner shall immediately notify all local tax collectors in the State as to the "average State school tax rate" so calculated. The tax collector for each municipality shall assess an amount equal to the "average State school tax" multiplied by the district's equalized assessed valuation upon all taxable ratables. Each local tax collector shall then collect and forward all revenues raised in this manner to the State Treasurer who shall distribute them (in conjunction with any funds appropriated by the Legislature) to the local school districts in amounts approved by the Commissioner of Education in order to fully fund each local school budget. (4) The funds appropriated by the Legislature for school aid

---

[6]These provisions are intended to correct discrepancies in current school budgets which are attributable to the fact that budgetary calculations for some districts were based on the assumption that the 1975 Act would be fully funded, while others were based on the assumption that there would be little or no State aid.

shall be disbursed in accordance with this order and not with any other provision of law. The funds raised pursuant to this order shall be in lieu of revenues raised by any other local property tax scheme for school purposes.

The advantages of this remedy are evident. *Robinson V* made full funding a prerequisite to sustaining the facial constitutionality of the system of public education enacted under the 1975 Act. *Robinson V, supra,* 69 *N. J.* at 467. As the majority itself admits, that system without full funding continues to be invalid. Nevertheless, if the Legislature fails to fully fund the 1975 Act, the majority would avoid the unpleasant but necessary task of assuring needed revenues, and would instead consider the unthinkable option of closing the public schools as a viable alternative. No other course of action could so effectively frustrate the mandate which we have found to be implicit in the Education Clause. The remedy which I propose, by contrast, will assure a level of full funding regardless of a legislative default. By guaranteeing sufficient revenues to fill the gap left by the legislative inaction, this remedy will facilitate, rather than postpone, the long-awaited financial implementation of a constitutional system of public education.

In addition, the remedy which I suggest is a direct response to the basic deficiencies which underlie the current system of financing public schools. *See Robinson IV, supra,* 69 *N. J.* at 141; *Robinson I, supra,* 62 *N. J.* at 515, 520. Because all districts would derive their revenues from a common, statewide property tax base, it would substantially eliminate the "discordant correlation between the educational needs of the school districts and their respective tax bases" that produces the existing disparities in educational opportunity. Under this order, the resources available to districts would be fully equalized on a per pupil basis. In addition, expenditure levels per pupil would undoubtedly become more equitable as a result.

While I recognize that the thought of imposing an additional local property tax burden presents a nightmare,[7] I do not believe that the solution to this crisis is to abandon the cause of free public education. Instead, by ordering "equalization" of the entire pool of funds allocated for public education for the 1976-1977 school year, (rather than "equalizing" only those funds for which the State is responsible), I have suggested the most equitable remedy possible. Those districts best able to afford the burden would bear the greatest percentage of its costs. While I realize that hardship might result in individual cases, the remedy which I propose is only intended as a temporary solution, and might be vacated entirely by timely legislative compliance with the constitutional mandate.

Finally, while it is true that final tax bills for 1976 would not be mailed until sometime in July under this remedy, the delay, though unfortunate, is not unprecedented. Such delays often occur during years in which municipalities undergo revaluation of their ratables. Once these revenues are collected, though, distribution of the funds should proceed without much difficulty, since each local school district would receive, upon approval by the Commissioner, funds equal to the amounts appropriated in its budget.

The power of this Court to impose such a remedy is clear. As we recognized in *Robinson IV, supra*:

> Under emerging modern concepts as to judicial responsibility to enforce constitutional right there has been no paucity of examples of affirmative judicial action toward such ends. *Jackman v. Bodine*, 43 *N. J.* 453 (1964); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 *U. S.* 1, 91 *S. Ct.* 1267, 28 *L. Ed.* 2d 554 (1971); *Griffin v. School Bd. of Prince Edward County*, 377 *U. S.* 218, 233-34,

---

[7] In the real world of 1976, that tax base is already overburdened; further taxes on impoverished urban and local rural communities may result in hardships. This condition exists because of the most oppressive local property tax of almost any state in the nation. *New Jersey Tax Policy Comm., Report*, Part II, "The Property Tax" 1 (Feb. 23, 1972).

84 *S. Ct.* 1226, 1234–1235, 12 *L. Ed.* 2d 256, 266–67 (1964) ; *Hawkins v. Shaw, Mississippi*, 437 *F.* 2d 1286 (5th Cir. 1971) ; *Kennedy Park Homes Ass'n v. Lackawanna, N. Y.*, 436 *F.* 2d 108 (2d Cir. 1970), *cert.* den. 401 *U. S.* 1010, 91 *S. Ct.* 1256, 28 *L. Ed.* 2d 546 (1971) ; *Mills v. Bd. of Educ.*, 348 *F. Supp.* 866 (D. D. C. 1972). [69 *N. J.* at 152]

In particular, where those initially charged with implementing a remedial program have failed to meet their responsibility, courts have undertaken affirmative action and have exercised powers as broad as the inequities to be corrected. *Keyes v. School District No. 1*, 413 *U. S.* 189, 212, 93 *S. Ct.* 2686, 37 *L. Ed.* 2d 548, 565 (1973) ; *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 *U. S.* 1, 15–16, 91 *S. Ct.* 1267, 28 *L. Ed.* 2d 554, 566 (1971) ; *Newman v. Alabama*, 503 *F.* 2d 1320, 1332–1333 (5 Cir. 1974), *cert.* den. 421 *U. S.* 948, 95 *S. Ct.* 1680, 44 *L. Ed.* 2d 102 (1975) ; *Hobson v. Hansen*, 269 *F. Supp.* 401, 517 (D. D. C. 1967). This power necessarily includes the authority to require the collection of revenues in cases where protection of a fundamental constitutional right depends on the availability of funds. *See, e. g., Boddie v. Connecticut*, 401 *U. S.* 371, 91 *S. Ct.* 780, 28 *L. Ed.* 2d 113 (1971) ; *Griffin v. School Bd. of Prince Edward Cty.*, 377 *U. S.* 218, 232–234, 84 *S. Ct.* 1226, 12 *L. Ed.* 2d 256, 266–267 (1964) ; *Griffin v. Illinois*, 351 *U. S.* 12, 76 *S. Ct.* 585, 100 *L. Ed.* 891 (1956) ; *United States v. Missouri*, 515 *F.* 2d 1365, 1371–1372 (8 Cir. 1975), *cert.* den. 423 *U. S.* 951, 96 *S. Ct.* 374, 46 *L. Ed.* 2d 288 (1975) ; *Wyatt v. Stickney*, 325 *F. Supp.* 781, 784–785 (M. D. Ala. 1971), aff'd 344 *F. Supp.* 373, 377 and 344 *F. Supp.* 387, 392 (M. D. Ala. 1972), aff'd *sub nom. Wyatt v. Aderholt*, 503 *F.* 2d 1305 (5 Cir. 1974) ; *Brewer v. School Bd. of Norfolk*, 456 *F.* 2d 943, 946–948 (4 Cir. 1972), *cert.* den. 406 *U. S.* 933, 92 *S. Ct.* 1778, 32 *L. Ed.* 2d 136 (1972) ; *Bradley v. Milliken*, 345 *F. Supp.* 914, 938 and cases cited therein (E. D. Mich. 1972) aff'd 484 *F.* 2d 215, 258 (6 Cir. 1973), rev'd on other grounds and remanded, 418 *U. S.* 717, 94 *S. Ct.* 3112, 41 *L. Ed.*

2d 1069 (1974). For example, as the United States Supreme Court stated in *Griffin v. School Bd. of Prince Edward County, supra*:

> [T]he District Court may, if necessary to prevent further racial discrimination, require the Supervisors to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate and maintain without racial discrimination a public school system in Prince Edward County . . . . An order of this kind is within the court's power if required to assure these petitioners that their constitutional rights will no longer be denied them. [377 *U. S.* at 233–234; 84 *S. Ct.* at 1234, 12 *L. Ed.* 2d at 266–267]

In addition, the particular type of remedy which I suggest for the instant case is not without judicial precedent. In *Jenkins v. Tp. of Morris School District and Bd. of Educ.*, 58 *N. J.* 483 (1971), a case which involved an emerging pattern of *de facto* school segregation, this Court held that the Commissioner of Education could compel a merger of two separate school districts with the attendant merger of their correspondng tax bases, if such action was necessary to further state school desegregation policies. Similarly, in *United States v. Missouri, supra*, 515 *F.* 2d 1365, another school desegregation case, the Court held that the District Court possessed the power to order a merger of three adjoining school districts and to compel the subsequent imposition of school property taxes at a uniform rate sufficient to assure operation of the new, consolidated district.

Finally, there are no constitutional impediments to the remedy which I suggest. The Constitution does not prohibit this Court from exercising its equitable powers to require political subdivisions of the State to raise revenues for statutorily or constitutionally mandated purposes. *Van Riper v. Bd. of Freeholders*, 137 *N. J. L.* 714 (E. & A. 1948); *Hudson Cty. v. Zink*, 135 *N. J. L.* 1 (Sup. Ct. 1935); *cf. State v. Rush*, 46 *N. J.* 399 (1966). Such orders do not impinge upon the doctrine of separation of powers, *N. J. Const.* (1947), Art. III, § I, which solely concerns the inter-

relationship of coordinate branches of government. Moreover, such orders do not contravene the Appropriations Clause, *N. J. Const.* (1947), Art. VIII, § II, par. 2, which applies only to funds "drawn from the State Treasury."[8] In *Van Riper v. Bd. of Freeholders, supra,* for example, the Court expressly upheld its own power to order such appropriations, though it declined to do so in that case:

> Direction might well have been [given] to compel an appropriation of the money necessary to meet the bill and then pay same, but we are not here concerned with the form of the command. [137 *N. J. L.* at 716–17]

In another line of cases which involved delinquencies in payment of locally raised county tax or state school tax revenues to the county tax collector, New Jersey courts did, in fact, order the necessary funds to be raised — by borrowing if necessary — to pay the arrearages. *Booth v. Parnell,* 12 *N. J. Misc.* 413, 172 *A.* 50 (Sup. Ct. 1934); *Tipping v. Doughtery,* 11 *N. J. Misc.* 931, 169 *A.* 671 (Sup. Ct. 1933); *Shields v. Paterson,* 55 *N. J. L.* 495 (Sup. Ct. 1893); *Ross v. Walton,* 63 *N. J. L.* 435 (Sup. Ct. 1899), aff'd, 67 *N. J. L.* 688 (E. & A. 1901); *Trewin v. Shuris,* 74 *N. J. L.* 200 (Sup. Ct. 1906); *Coe v. Englewood,* 68 *N. J. L.* 559 (Sup. Ct. 1902); *Bayonne v. Kingsland,* 41 *N. J. L.* 368 (E. & A. 1879). If the Court can order the collection of revenues where local taxes are insufficient to meet statutorily mandated costs, then surely it can do so when the funds raised will be insufficient to satisfy a constitutionally mandated expenditure.

In exercising the remedial power to which I have referred, the Court would not be acting as a "super-legislature," in the sense that it would decide whether particular legislative policies are "unwise, improvident, or out of harmony with a

---

[8]In any event, should there remain a theoretical conflict between the Appropriations Clause and the Education Clause, this Court has held that the latter is controlling for purposes of this litigation. *Robinson IV, supra,* 69 *N. J.* at 154.

particular school of thought." *N. J. Chapt., American Institute of Planners v. N. J. State Bd. of Professional Planners,* 48 *N. J.* 581, 609 (1967). Instead, it would seek compliance by the State with an obligation which is clearly mandated by the Constitution. Failure to undertake necessary judicial initiative would clearly constitute an abandonment of our own responsibility. *See Robinson IV, supra,* 69 *N. J.* at 152. By its action today, the majority not only fails to meet the default of the Legislature and the Executive, but by the relief which it would impose, effectively threatens the continuance of public education in this State.

I regret that I cannot concur in the majority opinion. I shudder at the thought of seeing 1-1/2 million of our school children confronted with closed school doors while they await legislative action. These children are the real pawns in the chess game of *Robinson v. Cahill.*

It does not matter to the children of New Jersey that the failure to provide the educational opportunities guaranteed by the Constitution is the by-product of deadlock within the coordinate branches of government. However arduous and bona fide those efforts have been, the obligation has not been met by the legislative and executive branches.

The system of educational finance was and is unconstitutional as well as unfair. And the constitutional requirement to comply with the Education Clause — to assure for each child that type of education which our constitution mandates — is perpetual.

I state again — we should not fear unpopularity. Our children must and will receive the necessary education. We identified a profound violation of the Constitution. We have the capacity to take corrective action and remedy the violation. Closing the schools is an abdication of any effort to provide a remedy. This action makes us a party to the very wrong which we denounced last January.

Despite its unpopularity and its overwhelming burden, I believe that I have proposed the only remedy which at this

time offers the surest, fairest and most equitable means of achieving this essential goal. I therefore must dissent.

*For the Order*—Chief Justice HUGHES, Justices SULLIVAN, CLIFFORD and SCHREIBER and Judge CONFORD—5.

*Opposed*—Justices MOUNTAIN and PASHMAN—2.